## Richmond

BASSETT FURNITURE INDUSTRIES, INC. v. ROBERT F. MCREYNOLDS.
ROBERT F. MCREYNOLDS v. BASSETT FURNITURE INDUSTRIES, INC.

April 23, 1976.

Record Nos. 750781 and 750743.

Present, I'Anson, C.J., Carrico, Harman, Poff and Compton, JJ.

*S. D. Roberts Moore; James R. Austin (Gentry, Locke, Rakes & Moore,* on brief), for plaintiff in error in Record No. 750781.

*R. Reid Young, Jr.; Jackson L. Kiser; Robert W. Mann; (Young, Kiser, Haskins & Mann, Ltd.,* on brief), for defendant in error in Record No. 750781.

*R. Reid Young, Jr.; Jackson L. Kiser; Robert W. Mann (Young, Kiser, Haskins & Mann, Ltd.,* on briefs), for plaintiff in error in Record No. 750743.

*S. D. Roberts Moore; James R. Austin (Gentry, Locke, Rakes & Moore,* on brief), for defendant in error in Record No. 750743.

POFF, J., delivered the opinion of the court.

Robert F. McReynolds (plaintiff), an employee of Industrial Air, Inc. (Industrial), suffered injuries rendering him a paraplegic when he fell through a hole in a floor cut to accommodate a conveyor system Industrial was installing in the Virginia plant of Bassett Furniture Industries, Inc. (Bassett). After receiving workmen's compensation benefits from Industrial, plaintiff filed a motion for judgment against Bassett. Bassett moved to dismiss on the grounds that plaintiff was its statutory employee and that the trial court, therefore, had no jurisdiction over the tort action. Upon stipulation, the trial court heard evidence *ore tenus* and, having considered memoranda of law and oral argument, overruled the motion.

A jury was then empaneled and, after three days of testimony, returned a verdict awarding plaintiff $1,000,000 in damages. The trial court sustained Bassett's motion to set the verdict aside as excessive and ordered plaintiff to remit $450,000 or submit to a new trial on damages. Exercising his right under Code § 8-350 (Repl. Vol. 1957), plaintiff accepted remittitur under protest. By final order entered March 13, 1975, incorporating a letter opinion dated February 27, 1975, the trial court awarded judgment to plaintiff in the sum of $550,000. We granted writs of error to both parties.

## A.

The jurisdictional question whether plaintiff was Bassett's statutory employee is the threshold issue. That issue turns upon a mixed question of law and fact. The trial court sat as the fact-finder, and, insofar as the evidence is in conflict, we view the facts and all inferences reasonably deducible therefrom in the light most favorable to the plaintiff and consider whether the trial court correctly applied the law thereto.

Bassett's principal witness in support of its motion to dismiss was James Minter. His job title at Bassett was "Chief Engineer", although, as he said, "I am not an industrial engineer." The facts underlying the jurisdictional issue are found largely in his testimony.

Bassett is a furniture manufacturer with annual sales of "something over a hundred and fifty million [dollars]". Its plants in eight states employ about 7000 workers, 5000 of whom work in Virginia plants. In 1971, Bassett decided to enlarge its plant at Bassett, Virginia, by adding a $3,500,000, five-story warehouse adjacent to one of its existing buildings. Plans and specifications were prepared by Minter and the three other employees in Bassett's "engineering department". Bassett "put these out for bids" and awarded separate contracts to different contractors for construction of the "building shell", for "demolition of an existing building", for "installation of an elevator facility", for installation of "interior sprinkler work", and for certain other work. Bassett's plans called for installation of a conveyor system serving four floors of the new building and connecting with an existing conveyor system in an existing building. Bassett awarded a $173,722 "turn-key job" contract to Industrial. Minter acknowledged that Industrial was "an independent contractor to install the conveyor system." Bassett did not prepare the plans and specifications for this contract but, as Minter said, "[w]e only showed the path of flow and the general arrangement of the conveyor, the specific shop drawings or drives on

it and so on were done by Industrial Air", and Industrial supplied all materials. While Bassett did the electrical work and periodically inspected Industrial's work for compliance, it had no control over Industrial's employees and never required any "specific changes".

In order for the conveyor to pass from the second floor to the ground floor, it was necessary to cut a hole in the second floor of an existing building. Responsibility for the cutting was not included in Industrial's contract, and Bassett's carpenters did the work. It was this hole through which plaintiff fell while working on the conveyor system. The circumstances surrounding his fall will be considered in Part B.

In the last four years, Bassett had spent about $1,000,000 per year on construction work. However, Bassett had no "separate construction division" and employed only a "dozen or so" carpenters "on the maintenance crews" and about 60 electricians. These and other Bassett employees were sometimes called upon to perform certain tasks in connection with new construction projects, but "[t]his would normally be confined to electrical, piping, mechanical work and that type of thing." Minter testified that "for the past few years, we have been contracting most all of the work outside and using our people to make modifications to tie in with these." On "major projects" involving in excess of $25,000, Bassett's policy was to employ independent contractors, because it was uneconomic to assemble Bassett employees from different plants and take them away from their regular jobs. On projects involving less than $25,000, Bassett did all "[o]r a portion of it, depending on our people and the availability of them and what other jobs they were doing."

Bassett did not maintain a separate work crew "for the purpose of conveyor systems". Minter testified that "we have the capability" and "we do some designing and building in our own maintenance shops" but that is done "with employees who have other jobs and it generally depends upon the need and the time involved as to whether they would do it or we would have it done outside. Generally, on a job of this size, it would always be contracted out." Minter said that "we actually build new conveyors" but acknowledged that "Bassett had never undertaken anything of this magnitude."

Addressing the jurisdictional issue, Bassett says that when an owner acts as its own general contractor and contracts, in whole or in part, with subcontractors for the performance of construction work, the owner-general contractor becomes a statutory employer and the

subcontractor's employees become statutory employees if "the specific, specialized work being done by the specialty subcontractor and his injured employee is the kind of work which employees of the owner-general contractor usually do."

Code § 65.1-29 (Repl. Vol. 1973) provides that when an owner "undertakes to perform or execute any work which is a part of his trade, business or occupation and contracts with" a subcontractor "for the execution or performance by or under such subcontractor of the whole or any part of the work", the owner becomes a statutory employer and the subcontractor's employees become statutory employees of the owner.

Code § 65.1-30 (Repl. Vol. 1973) provides that when a general contractor contracts with an owner to perform work which "is not a part of the trade, business or occupation of" the owner, and contracts with a subcontractor for the performance "of the whole or any part of the work", the general contractor becomes the statutory employer of the subcontractor's employees.

Under Code § 65.1-31 (Repl. Vol. 1973), an owner covered by Code § 65.1-29 or a general contractor covered by Code § 65.1-30 becomes the statutory employer of the employees of a secondary subcontractor to whom a primary subcontractor has awarded a subcontract.

These three statutes must be "read and reconciled with" the language in what is now Code § 65.1-5 (Repl. Vol. 1973). *Sykes* v. *Stone & Webster Eng. Corp.*, 186 Va. 116, 121, 41 S.E.2d 469, 471 (1947). That language provides that "[n]othing in this Act . . . shall be construed to make . . . the employees of an independent contractor the employees of the person . . . contracting with such independent contractor."

When so read and reconciled:

> "It clearly appears to be the purpose . . . to bring within the operation of the Compensation Act all persons engaged in any work that is a part of the trade, business or occupation of the original party who undertakes as owner, or contracts as contractor, to perform that work, and to make liable to every employe[e] engaged in that work every such owner, or contractor, and subcontractor, above such employee. But when the employe[e] reaches an employer in the ascending scale, of whose trade, business or occupation the work being performed by the employe[e] is not a part, then that employer is not liable to that employe[e] for compensation. . . .

At that point [Code § 65.1-5] intervenes and the employe[e]'s right of action at common law is preserved." 186 Va. at 122-23, 41 S.E.2d at 472; quoted with approval in *Anderson* v. *Thorington Construction Co.*, 201 Va. 266, 271, 110 S.E.2d 396, 399-400 (1959).

In *Sears, Roebuck & Co.* v. *Wallace*, 172 F.2d 802, 810 (4th Cir. 1949), the court quoted the above passage from *Sykes* and concluded:

> "[T]he chief purpose of enactments like the Virginia statute . . . is to 'protect the employees of subcontractors who are not financially responsible and to prevent employers from relieving themselves of liability (for compensation) by doing through independent contractors what they would otherwise do through direct employees.' See notes 58 A.L.R. 872; 105 A.L.R. 580. The statute was not intended to relieve employers from liability for their own negligence which causes injury to the employees of independent contractors engaged in the performance of work for employers outside the scope of the latter's occupation."

Thus, an owner, simply by acting as its own general contractor, contracting with independent contractors, does not thereby become a statutory employer unless the work performed by the independent contractor "is a part of [the owner's] trade, business or occupation".

Whether the work is such a part depends upon the facts and circumstances in each case, and for that reason the question does not readily yield to categorical or absolute standards. However, we believe that the most reliable test is the one quoted and applied by this Court in *Shell Oil Co.* v. *Leftwich*, 212 Va. 715, 722, 187 S.E.2d 162, 167 (1972).

> " '[T]he test is not one of whether the subcontractor's activity is useful, necessary, or even absolutely indispensable to the statutory employer's business, since, after all, this could be said of practically any repair, construction or transportation service. The test (except in cases where the work is obviously a subcontracted fraction of a main contract) is whether this indispensable activity is, in that business, *normally* carried on through employees rather than independent contractors.' (Emphasis supplied)." (Citation omitted).

Frequency and regularity of performance are factors to be considered in determining whether work is "normally carried on through employees". *See generally*, 1A A. Larson, *The Law of Workmen's*

*Compensation* § 49.12 (1973). Mere capacity to perform, standing alone, is not determinative. *Holt* v. *Bowie,* 343 F. Supp. 962, 965 (W. D. Va. 1972). *See also Gaston* v. *Cooperative Farm Chemicals Association,* 450 S.W.2d 174, 180-81 (Mo. 1970). Nor is performance which is a *de minimis* part of the total business operation. *Sun Oil Company* v. *Lawrence,* 213 Va. 596, 194 S.E.2d 687 (1973).

In the manufacturing industry, construction work is typically outside the custom of the trade, and manufacturers who use their employees for such work generally do so only infrequently and irregularly. The courts have largely agreed that such manufacturers are not statutory employers of employees of independent contractors hired for such work. *See e.g., Ray* v. *Monsanto Company,* 420 F.2d 915 (9th Cir. 1970) (construction of new furnace); *King* v. *Palmer,* 129 Conn. 636, 30 A.2d 549 (1943) (installation of new heating system); *Hataway* v. *Proctor & Gamble Manufacturing Co.,* 195 Kan. 335, 405 P.2d 350 (1965) (construction of plant addition); *Duplechin* v. *Pittsburgh Plate Glass Company,* 265 So.2d 787 (La. App. 1972) (construction of new electrical generating facilities). On the other hand, where a manufacturer regularly does its own construction work with its own employees, a different result may be reached. In *Walker* v. *United States Gypsum Company,* 270 F.2d 857 (4th Cir. 1959), *cert. denied,* 363 U.S. 805 (1960), a manufacturer maintained a full-time construction division and, using its own employees, performed all of the construction work on plant additions, modifications, and modernizations and part of the work on new plant construction; there, the court held that the manufacturer was the statutory employer of an employee of a plumbing subcontractor working on construction of a new plant.

Here, the trial court, focusing upon frequency and regularity, summarized the facts and circumstances underlying its decision that Bassett was not plaintiff's statutory employer. Bassett was a manufacturer of furniture. It maintained no separate construction division. Only a negligible fraction of its 7000 employees was trained in construction skills. Carpenters and similar craftsmen were assigned to maintenance crews. Depending upon their "availability" and "what other jobs they were doing", they were sometimes used to construct all or part of minor projects and sometimes "to make modifications to tie in with" major projects.

While Bassett had spent $1,000,000 annually for the last four years on construction work, the evidence was that "for the past few years,

we have been contracting most all of the work outside". Bassett had the capacity to build new conveyors, but "on a job of this size, it would always be contracted out", and "Bassett had never undertaken anything of this magnitude."

*Moak* v. *Link-Belt Company*, 229 So.2d 395 (La. App. 1946), is a case factually analogous to the case at bar. There, a sugar manufacturer contracted with an independent contractor to install a major conveyor system in its refinery. Several injured employees of the independent contractor brought tort actions against their employer and the manufacturer. The question at issue was whether the work was a part of the manufacturer's business. While the court found that the manufacturer "has itself on other occasions done some of the same kind of work . . . [and] has in the past installed a conveyor system with its own labor, although not of this magnitude or complexity", the court concluded that installation of the new conveyor system was "not part of the operation of a refinery" and ruled that the tort actions were not barred by the workmen's compensation statute. *Id*. at 412-13.

We hold that the evidence was sufficient to support the trial court's finding that the work in which plaintiff was engaged at the time of his injury was not "a part of" the business normally carried on by Bassett through its own employees, that the trial court applied the correct principles of law, and that the trial court properly overruled Bassett's motion to dismiss.

## B.

Primary negligence on the part of Bassett is not at issue on appeal. Bassett contends that plaintiff was guilty of contributory negligence as a matter of law.

On the day before the accident, plaintiff helped "measure out" a place on the concrete ground floor where a steel "vertical" was to be positioned. It was Bassett's responsibility to cut a hole in the second floor "two feet long, one foot wide", large enough to admit the vertical but small enough to allow welders to "work around it." Plaintiff acknowledged that he knew that once a vertical was installed the small hole would have to be enlarged to accommodate the conveyor system but said that he "didn't know when" this particular hole would be cut and enlarged.

At 7:00 a.m. on the day of the accident, plaintiff arrived at work and "walked through" the area on the second floor where the conveyor was scheduled to descend to the ground floor and saw no hole.

Plaintiff worked on the second floor level for about two hours, operating the "button" which started and stopped the conveyor. About 9:00 a.m., a chain became wedged in one of the turns of the conveyor system, and plaintiff and the other Industrial employees engaged in the installation work took a "break". After 20 to 30 minutes, the men returned to the job site and resumed their efforts to free the chain.

Industrial "had actually laid the floor opening out during the previous week". Designed to be seven feet wide and twenty-four feet long, the hole had been "fifty percent" to "two-thirds" completed some "thirty to forty-five minutes" before the accident. Bassett's carpenters had used a "skill saw" which made "quite a bit" of noise, but plaintiff, whose work post was 65 to 75 feet away, testified that he "didn't hear them working" because there "was a whole bunch of people working there that morning" and he "had no reason to be watching other people."

After the "break", plaintiff and two other Industrial employees began pulling on the chain (or a rope tied to the chain) while Curtis Griffin beat upon the chain with a "truck standard". Plaintiff was stationed at the rear nearest the hole, looking at the conveyor above his head and "concentrating on getting that chain pulled off." When the chain snapped free, plaintiff fell back, through the hole, to the floor below which was strewn with debris.

Griffin testified that he was about 15 feet from the hole facing the three men pulling on the chain; that he "knowed it was going to be a hole cut out, but I didn't know when" and "thought they would leave it like the first hole they cut. They cut a small hole in one"; and that he did not see the opening in the floor until he ran over to the edge, and "I had to stop real quick before I went through it myself."

Thomas Wilkins, who was immediately in front of plaintiff; said that he had been working in the area "all that morning"; that after the break, he did not see a hole, heard no warnings about it, and saw no signs, railings, or sawhorses; and that when the chain he was pulling broke loose, "I liked to have went through the hole myself."

Donald Jones, Industrial's project engineer, testified that Bassett had removed the "main flooring" sometime before the day of the accident but that the subflooring was still intact and people were walking on it when he arrived at work at 7:30 a.m.; that after the "break" he heard no warnings about a hole; and that although he was standing "less than ten" feet away, he did not see the hole because "general conditions did not permit such."

One of Bassett's witnesses, the plant "firewatch", testified that he had worked on the second floor that morning "the whole time" and was standing six steps from the conveyor when plaintiff fell but did not know that the hole had been cut.

Other than the carpenters involved, no witness for either party testified that he knew that the hole was open, and all witnesses agreed that no warnings had been spoken or posted and no protective barricades had been erected.

The evidence concerning visibility in the accident zone was conflicting. Bassett's witnesses said that there were three rows of fluorescent lamps in the ceiling above the hole and that all were burning. There was a window in the wall behind the hole and two windows beneath the hole on the ground floor. Griffin said, however, that the window behind the hole "didn't put out much light" because it "was covered with sawdust" and "the middle section had clear glass, and the other part around it was a safety glass, like wire-type stuff through it, and you couldn't see through it" and that there "wasn't much light back in that area". Wilkins said that the lighting conditions were "right dim" and the ceiling fixture "wasn't much light". Jones characterized the "general lighting conditions" as "spotty to very minimal."

The subflooring in which the hole was cut was described as "dark-colored" and "almost black". Asked to explain why he had not seen the hole, Jones said:

"A. Well, as I suggested earlier, the lighting conditions, the general overall surroundings, even with the main flooring being removed, offered a camouflage for the hole. In fact, the subflooring looked very much like the main flooring when it was removed. It was dark on the first floor. Again there were no indications of a lighted condition.

"Q. There was no light coming up through the hole from the first floor?

"A. None significant. It only became obvious to me that a hole was there when I saw the man disappear through it."

Bassett argues that "when a defect or dangerous condition is 'open and obvious' to a person who is exercising reasonable care for his own safety, then such person is guilty of contributory negligence as a matter of law if he is injured by such defect or dangerous condition."

Under this rule, contributory negligence becomes a question of law only when the stated premise is satisfied. If the only reasonable

conclusion to be drawn from all of the evidence is that the defect would have been obvious to a reasonably prudent man under the same or similar circumstances, the premise is satisfied. If, however, the evidence concerning the circumstances is conflicting, or if fairminded men could draw different inferences from uncontradicted circumstances, the premise remains an unanswered question of fact to be determined by the jury.

"We have held that the presence or absence of negligence is a question for the jury, not only where there is a conflict in the evidence on the subject, but also where there is room for a difference of opinion among reasonable men as to the proper inference which might fairly be drawn from unconflicting evidence. Diverse inferences may reasonably be drawn from undisputed facts. Whenever the facts proved without dispute require the exercise of reason and judgment, so that one reasonable mind may infer that a controlling fact exists and another that it does not exist, there is a question for the jury.

. . .

"In Virginia this court has held in innumerable cases that whether one has been guilty of negligence is a mixed question of law and fact. Where there is no controversy in regard to the facts or the inferences that fairly may be drawn from them, the question of negligence is one of law. On the other hand, where the facts are in dispute or where diverse inferences reasonably might be drawn by men of reasonable minds, then it is a jury question. This is, of course, also true as to contributory negligence." (Citation omitted). *Acme Markets* v. *Remschel*, 181 Va. 171, 178-79, 24 S.E.2d 430, 434 (1943).

Bassett argues that a reasonably prudent worker, familiar with the design, function, and planned location of the conveyor system, would have anticipated the possibility that a hole existed and taken care commensurate with the danger. It is true that plaintiff anticipated that a small hole would be cut to admit the vertical and later enlarged to accommodate the conveyor, but he did not know when, and only two hours before his accident, he had walked through the area and seen that the hole had not yet been cut. Even so, Bassett says, plaintiff should have seen the carpenters at work, heard the noise of their electric saw, and been forewarned that the hole was being cut. But plaintiff, involved in the performance of his own duties, said that he

had not heard the carpenters working and had no reason to be watching other workers.

Bassett then reasons that if plaintiff was working close enough to the hole to fall through it, he was close enough to see it before he fell. At the time of his fall, plaintiff, with his back to an unknown danger, was looking at the conveyor above his head, not at the floor, and was "concentrating" on freeing the chain. Even if he had not been so preoccupied and had made a deliberate effort to look in the area behind him, the question remains whether the hole was "open and obvious" to a reasonably prudent man. There were no warning or protective devices indicating the existence of a hole. While there was some natural and artificial light in the area, there was evidence to show that it was insufficient to illuminate the danger. The floor surrounding the hole was "dark-colored". "It was dark on the first floor" and there was no "significant" light passing from the lower level through the hole. It is reasonable to believe, as an eyewitness with long engineering experience testified, that such surroundings and lighting conditions created a "camouflage for the hole" which "only became obvious" when plaintiff fell. At the very time the carpenters were cutting the hole, several men who had been working at a spot nearer the hole than plaintiff had not seen the danger, and two men performing the same work as plaintiff almost suffered the same fate.

The testimony concerning the circumstances was conflicting and diverse inferences were reasonably deducible from uncontradicted circumstances. We hold, therefore, that the trial court properly submitted the question of contributory negligence to the jury and that the evidence was sufficient to support the jury's finding.

## C.

Three additional questions are raised by Bassett's assignments of error. One is an evidentiary question related to Bassett's primary negligence. Since the jury's finding of primary negligence is not challenged on appeal, it is unnecessary to consider this question.

The second question concerns the admissibility of the testimony of certain witnesses present in the building when the accident occurred. Bassett argues that "[w]hether or not Jones, Wilkins and Griffin saw the hole is an irrelevant, collateral matter." We do not agree.

Whether the hole was "open and obvious" to a reasonable man was, as we have said, a factual question subsidiary to the ultimate question

of contributory negligence. The fact that the hole was not seen by the plaintiff does not, of course, resolve that factual question. Nor does the fact that it was not seen by another man or by several other men under the same or similar circumstances. However, while such facts, standing alone, were insufficient to resolve the question, they were sufficient to raise an inference that conditions were such that the danger was not open and obvious to a reasonable man similarly situated. That inference constituted some evidence relevant to the subsidiary factual question and was entitled to such weight as the jury felt it deserved.

■ The third question arises from a ruling of the trial court during the course of summation. On rebuttal, plaintiff supplemented his opening argument on damages. Bassett objected on the ground that it had not argued damages. We find from the record that Bassett did allude to the plaintiff "as a man who is in serious circumstances" and to the fact that the plaintiff "has had his spinal cord injured." We are of opinion that the trial court, in the exercise of its "supervisory control over the argument of counsel", did not abuse its "broad discretion". *Cohen* v. *Power*, 183 Va. 258, 262, 32 S.E.2d 64, 65 (1944); *accord*, *Jordan* v. *Taylor*, 209 Va. 43, 51, 161 S.E.2d 790, 795 (1968).

## D.

■ We turn now to the question concerning remittitur, the sole issue raised by plaintiff's assignment of error.

Plaintiff claimed damages in the sum of $2,500,000. Medical expenses accumulated at the time of trial were $20,382.01. While a doctor testified that plaintiff will be more susceptible to infection in "the kidney system, and obviously is going to require more in the way of medical care than an uninjured individual might", he was unable to give any estimate of the cost, and plaintiff offered no evidence by which future medical expenses could be measured. Based upon a wage history of $7000 per year and a work expectancy of 32 years, the present value of lost wages was fixed at $146,398.32. The jury returned a verdict of $1,000,000. The trial court ordered a remittitur of $450,000 and placed plaintiff on terms. Invoking his statutory privilege, plaintiff accepted judgment in the sum of $550,000 under protest and pursued his appeal.

At the time of his injury, plaintiff was 33 years of age, married, and the father of two daughters, ages 10 and 11. After dropping out of school in the tenth grade, he had been employed in factory jobs and

construction work. Except for a bleeding ulcer, he had enjoyed good health and actively engaged in outdoor activities. The "final clinical impression" recorded at Duke University Medical Center to which plaintiff had been transferred by the receiving hospital showed: "1. Paraplegia secondary to thoracic spine fractures (T4 and T5). 2. Cervical spine compression fractures. 3. Dislocation of proximal interphalangeal joint, third digit, left hand. 4. Bilateral pneumonia, resolving." The doctor testified that "when we say paraplegia we simply mean the person had paralysis from the waist down, not able to move or control that part of his body."

As a result of his paralysis, plaintiff has no control over his bladder and little control over his bowels and is embarrassed by unexpected "accidents". He has lost the power to perform the sexual function. His legs, which are smaller than before the accident and will continue to deteriorate, are subject to muscle spasms which cause "trembling and jerking". Largely confined to his bed, wheelchair, or car, plaintiff suffers recurring "bed sores".

Plaintiff's wife, who gave up her employment after the accident, has returned to work. She testified that while she is at work and the children are in school, plaintiff "tries to help hisself as much as he can" but on two occasions was compelled to call her home for assistance. Although plaintiff has accepted instruction in driving a car equipped with hand controls and, as his wife said, "has hopes of walking again" and "doesn't believe" the doctors, his condition is classified as total and permanent disability. Since his fall, plaintiff has suffered continuous pain under his "right shoulder blade" which he described as "like a knife sticking in my back." This pain, the doctor testified, will "be permanent unless you cut the nerve through which he feels the nerve sensations."

Plaintiff argues that, when a trial court orders remittitur and puts the plaintiff on terms, it is the appellate function to decide whether the jury's verdict was "excessive as a matter of law." Bassett says that the appellate function is to determine whether the order was an "abuse of discretion" on the part of the trial court.

At common law, the power to order remittitur lay within the sound discretion of the trial court. *Ches. & O. Ry. Co.* v. *Arrington*, 126 Va. 194, 217, 101 S.E. 415, 423 (1919). This rule has not been repealed or altered by the General Assembly. To the contrary, the legislature has tacitly recognized and implicitly ratified it. Code § 8-224 (Repl. Vol. 1957) provides that "the court before which a trial by jury is had,

may grant a new trial . . . where the damages awarded are too small [or] where they are excessive." Under Code § 8-350:

> "In any action at law in which the trial court shall require a plaintiff to remit a part of his recovery, as ascertained by the verdict of a jury, or else submit to a new trial, such plaintiff may remit and accept judgment of the court thereon for the reduced sum under protest . . . [and pursue an appeal]."

We considered these statutes in *Smithey* v. *Sinclair Refining Co.*, 203 Va. 142, 122 S.E.2d 872 (1961). There, the plaintiff contended that, in personal injury cases where there is no standard by which damages for pain, suffering, and mental anguish may be measured, a trial court has no power to order remittitur. Rejecting that argument and affirming an order to remit two-thirds of a jury's verdict, we said:

> "In personal injury cases, where the action merely sounds in damages and where there is no rule for measuring such damages, the amount to be awarded is left largely to the discretion of the jury. . . .
>
> . . .
>
> "But this is not to say that the verdict of a jury is not subject to the control of the courts. A healthy administration of justice requires that in a proper case, the courts must take action to correct what plainly appears to be an unfair verdict. This authority is an ancient and accepted part of the common law. . . .
>
> . . .
>
> "The law has wisely placed in the hands of the trial judge the power to exercise his sound discretion in supervising the verdicts of juries to prevent miscarriages of justice. The law intends that this power should be exercised, and that the judge should be more than a mere referee between the litigating parties. *The ultimate test, in a case of this nature, is whether or not the discretion has been abused.*" (Emphasis added). 203 Va. at 145-46, 148, 122 S.E.2d at 875, 877.

*Accord, Clatterbuck* v. *Miller*, 215 Va. 359, 209 S.E.2d 904 (1974); *National Cab* v. *Thompson*, 208 Va. 731, 160 S.E.2d 769 (1968).

In determining whether a trial judge has abused the discretion vouchsafed to him by the statutes and the common law we must examine the grounds upon which he based his order of remittitur.

"[T]he record must show the grounds relied on in support of such action, otherwise it cannot be upheld." *Hoffman* v. *Shartle*, 113 Va. 262, 264, 74 S.E. 171, 172 (1912). Absent a statement of the grounds, we must assume that the trial judge simply' disagreed with the jury's damage evaluation and arbitrarily substituted his opinion for theirs. In such case, entry of the order would clearly constitute an abuse of discretion.

On the other hand, when it appears from the record before us that the trial judge made a finding that the verdict was plainly excessive* and remittitur should be ordered and that, in reaching his conclusion, he considered factors in evidence relevant to a reasoned evaluation of the damages incurred and to be incurred, his order will not be disturbed on appeal if the recovery after remittitur bears a reasonable relation to the damages disclosed by the evidence. "Reasonableness" in this context is the standard by which the exercise of discretion must be tested in this Court.

By letter opinion, the trial judge found that the jury's verdict "is so excessive as to shock the conscience of this Court" and that it "creates the impression that the jury misconceived or misunderstood the facts or the law, and is not the product of a fair and impartial decision." The opinion expressly recited the "background and explanation" for the order of remittitur. From this recitation, it appears that the trial judge considered: plaintiff's age, life expectancy, work expectancy, work experience, wage history, education, and family obligations; plaintiff's loss of past and future earnings; the cost of medical attention; the nature and extent of plaintiff's "catastrophic and permanent" injuries and the curtailment of his normal activities; the nature and extent of his pain, suffering, humiliation, and embarrassment; and "the future cost to maintain and provide for the plaintiff and any special treatment that he may need."

Having considered these circumstances, the trial judge observed that, since plaintiff adduced no evidence by which damages for future medical expense could be ascertained, the jury's verdict must be construed as an award of $166,780.31 for "economic" damages and an

---

* For the definition of that term, we have repeatedly relied on language such as that in *Ches. & O. Ry. Co.* v. *Arrington, supra.* There, we said:

"[I]t is an ancient and accepted doctrine of the common law, that judges have the power and are clearly charged with the duty of setting aside verdicts where the damages are either so excessive or so small as to shock the conscience and to create the impression that the jury has been influenced by passion or prejudice, or has in some way misconceived or misinterpreted the facts or the law which should guide them to a just conclusion." (Citation omitted).

award of $833,219.67 for "non-economic" damages. Applying the language of this Court, he found that the latter was excessive and ordered the total damage award reduced to $550,000. While, without benefit of personal presence at trial, we might feel that an award for non-economic damages higher than that determined by the trial court would be sustainable, we cannot say that the trial court erred in finding the jury's award excessive or that the recovery after remittitur bears no reasonable relation to the damages disclosed by the evidence.

In reaching our conclusion, we reaffirm what was said in *American Oil Co. v. Nicholas*, 156 Va. 1, 12, 157 S.E. 754, 758 (1931):

"The trial judge is more than a mere umpire in the trial of a common law action. Whether or not the sum awarded by the jury is inadequate or excessive is a legal question addressed to the sound discretion of the court, to exercise his supervisory power over verdicts to prevent gross miscarriage of justice. There are many incidents which occur in the trial of a common law case which a trial judge observes but which cannot be reproduced in the cold printed page. When, therefore, the trial court has made his ruling on such questions it will not be disturbed by this court unless it appears that there has been an abuse of his legal discretion."

\* \* \* \*

We have carefully considered all issues framed under the two writs of error, and we find no reversible error below. The judgment is

*Affirmed.*