JUSTICE KOONTZ,
with whom JUSTICE KEENAN joins, concurring in part and dissenting in part.
Beyond question, Regent University is a nonprofit “private Christian university” that benefits the people of this Commonwealth by providing them the opportunity to learn and to develop their intellectual capacities, Code § 23-30.39, through eight accredited colleges offering twenty graduate degrees. However, the quality of the educational experience provided by Regent is not at issue here.
While Regent rightfully enjoys a reputation for educational excellence, the record demonstrates that Regent seeks to educate its students in strict conformity with its adopted Mission Statement. According to this Statement, Regent “exists to bring glory to God the Father and His Son Jesus Christ through the work of the Holy Spirit[,] ... to provide an exemplary graduate education from biblical perspectives to aspiring servant leaders in pivotal professions” [, and] to be a leading “center of Christian thought and action.” Indeed, as noted in the majority opinion, Regent was founded to “train mature men and women for the challenge of representing Christ in their professions,” incorporated “to recover the Christian heritage of our nation,” and has the “ultimate purpose” to “glorify[] God and His Son, Jesus Christ.”
The majority concludes that Regent is a pervasively sectarian institution and that, for the reasons stated in the majority’s opinion, the use of bond-financed facilities by Regent’s School of Divinity is prohibited. I concur in these conclusions.
I disagree, however, with the majority’s conclusion that Regent otherwise qualifies to participate in the revenue bond program under consideration as an institution of higher education “whose primary purpose is . . . not to provide religious training or theological education.” Code § 23-30.41 (e). My conclusion to the contrary is based on three factors. First, the majority misstates the standard of review, and thereby fails to apply the law to the evidence viewed in the light *642 most favorable to Lynn and the other appellees, the prevailing parties at trial. Second, the majority violates established rules of statutory construction and effectively rewrites Code § 23-30.41(e), by determining that the statutory phrase “a nonprofit educational institution . . . whose primary purpose is . . . not to provide religious training or theological education” can be limited to institutions or departments within institutions that prepare students for specific religious vocations. Third, the majority bases its definition of this statutory phrase on source materials that are taken out of context.
Initially, I agree that the issue whether Regent is eligible for participation in the revenue bond program under the Educational Facilities Authority Act, Code §§ 23-30.39 through -30.58, is a mixed question of law and fact. However, contrary to the conclusion reached by the majority, the record reveals that certain material facts are in dispute. Thus, we are compelled to give deference to the factual findings of the trial court which “sat as the fact finder and, insofar as the evidence is in conflict, we view the facts and all reasonable inferences raised by the evidence in the light most favorable to [the prevailing party] and consider whether the trial court correctly applied the law thereto.” Carmody v. F. W. Woolworth Co., 234 Va. 198, 201, 361 S.E.2d 128, 130 (1987); Bassett Furniture v. McReynolds, 216 Va. 897, 899, 224 S.E.2d 323, 324 (1976).
As a mixed question of law and fact, the determination of Regent’s primary purpose presented factual issues for the trial court’s consideration. There was a clear conflict in the evidence presented by the VCBA, namely, between the content of the numerous exhibits and the trial testimony of Regent Provost Dr. William George Selig. Many of the exhibits were facially in conflict with Dr. Selig’s testimony. The trial court resolved that conflict against the VCBA by its finding that Regent’s primary purpose is religious training.
The fact that the court’s decision “was not based on any credibility findings with regard to the witnesses” does not reflect an absence of conflict in the evidence, but explains the court’s view that the witnesses’ testimony did not lack credibility. Thus, the court considered all the testimony and exhibits in reaching its ultimate determination, which is supported by evidence in the record.
Notably absent in the majority opinion is significant evidence that supports the trial court’s finding. The following evidence was presented concerning Regent’s colleges, academic freedom policy, and faculty and staff.
*643 The College of Communications and the Arts is designed to “develop persons who think as Christians about communication studies.” Its program in the School of Cinema-Television and Theatre Arts “is dedicated to equipping communication professionals with a biblically based perspective in the mass media and theatre arts.” Its Script and Screenwriting program is designed to “prepare graduates to become leaders who will be creative communicators through their script and screenwriting and their ability to implement the truths and principles of the Word of God.” “The program is administered and shaped for the purpose of helping students integrate the Word of God in their chosen profession.” Its Ph.D. program involves “an intense effort to develop scholars who are able to integrate a Christian worldview with their chosen discipline within communication as they teach, conduct research and practice their professions.” Prospective students must submit a writing sample “indicating [an] ability to integrate a Christian worldview with the field of communication and the arts and directly relating] that topic to the Word of God and/or the Judeo-Christian worldview.” The school looks for “students who closely identify with [Regent’s] mission of leadership-Christian Leadership.”
The School of Counseling (the school) seeks to help students “synergize personal faith with practice in public, private, academic, and corporate arenas,” and is “the only evangelical program of its kind on the East Coast.” The faculty of the school is “united by a common commitment to a Christian worldview.” The school’s programs “embody a model of Christian counseling[,] . . . based upon scriptural understanding of human nature.” The school “endeavors to provide leadership integration of sound clinical procedure and biblically based values in program development and health service provision.” A “distinctive” feature of its programs is “the integration of counseling knowledge, skills, and strategies with biblical foundations and faith practices.” The school summarizes this as follows:
[S]ince there is no agreed-upon definition regarding the use of faith within the counseling process, we present integration as a process rather than a separate course or series of techniques. Integration begins in our own Christian walk. Our programs give additional tools and guides for the process and, hopefully, plant seeds that continue to grow and mature long after the degree is obtained. We intentionally teach faith principles as integrated within counseling practice, recognizing that in an *644 academic setting this encounter may be artificial. A student’s understanding and knowledge of integration brings fruition in a counseling practice setting with continued processional and spiritual maturation and experience.

Biblical Foundations

We believe that God exists, is the source of all truth, and is a just, loving, compassionate Creator and Redeemer who calls us to relationship with Himself and others. Theory and practice in the field of counseling are taught in conjunction with application of biblical principles and values. Students are encouraged to study in such theological areas as hermeneutics, systematic theology, Christian ethics, the nature of God and man, and the use of biblical principles and Christian disciplines in the counseling setting.
The school offers three degrees: a clinical masters degree (M.A.), a nonclinical masters degree (M.A.), and a doctor of psychology degree (Psy.D.). The clinical M.A. “combines contemporary counseling techniques and theories with a solid biblical foundation for a spiritual balance in the counseling approach.” The nonclinical M.A. is “designed to offer human relations training to clergy and others active in Christian ministry who desire counseling skills.” “The purpose of this nonclinical track is to provide training and practice in interpersonal skills using a foundation of biblical human nature.” “The goal of the program is not to develop clinical professionals, but to train students who seek to help others within a church/ministry setting.” (Emphasis added). Finally, the doctorate program has “an integrative approach,” that calls for the “integration of faith and practice.” Courses offered by the school include:
Integrative Issues in Counseling!;] An exploration of the possibilities and limits for integrating various psychological theories and Christian faith in counseling. Students will review and assess previous models for integration as a step toward developing their own approach to integrating theory and Christian faith in clinical practice.
* % *
Hermeneutics and Application!;] This course analyzes and synthesizes principles of biblical hermeneutics and psychological practice. Students are taught basic skills in the inductive *645 method of observing, interpreting and applying the Christian Scriptures. As a means to this end, an intensive inductive study is made of the Gospel of Mark (chapters 1-3). Other passages from the Bible are considered as they address areas of therapeutic application for various psychological problems and disorders. Role-play and demonstration of application of skills are analyzed, critiqued and synthesized.
* * *
Traditions in Christian Healing: An Integrated Approach!;] A holistic Christological approach to exploring and reconsidering the gifts and graces of God for healing the various aspects of the human person. An integrated approach will include a biblically based analysis and synthesis of historical Christian traditions pertaining to healing and deliverance as these relate to the practice of counseling.
* * *
Clinical Practical;] A supervised clinical practicum experience in an appropriate work environment for six semesters for two credits per semester. Students will learn how to integrate their Christian worldview and practice with the theory and practice of psychology.
The School attributes the “ultimate goal” of counseling to be the patient’s “maturation in the image of Christ,” and it seeks to produce graduates who “reflect the character of Christ within their professional involvements.”
“The primary mission of the Regent University School of Education is to prepare leaders from a biblical perspective in order that they might significantly impact education worldwide.” Its “programs are based on time-honored biblical standards,” and its faculty have a “worldview based upon a core of biblical beliefs.” Through the program, “students learn how to integrate research-supported concepts and skills with a biblical worldview.” The “Christian School Program” of the School of Education “prepares Christian school teachers and administrators to educate toward God’s expectations for Holy Nation citizenship (I Peter 2:9).” This program offers classes such as:
*646 Christian Heritage[:] This course develops the theme of holy nation citizenship (I Peter 2:9) and its implications for Christian education. It provides the purpose and outcomes for Christian education using the subject matters of Biblical text, Christian history, Christian classics, and the skills of logic and rhetoric. . . .
Hermeneutics in Education[:] Students will learn to use inductive Bible study methods and apply them to educationally relevant questions. Additionally, students will learn how to teach Biblical content to learners of various ages.
Biblical Integration/Apologetics[:] This course focuses on the integration of Biblical content in the student’s personal and professional life. Students will examine methods, models and curriculum examples of personal and professional Biblical Integration. Students will also write a sample-integrated curriculum.
Regent’s School of Business’ mission is to “transform society through Christian leadership” and to prepare its students “to build dynamic organizations that provide life-improving products and services in a way that points to the life-giver, Jesus Christ [through] servant-leadership (Matthew 20:20-28).” The materials for the School of Business state that it “desires to admit students” who share the school’s mission and who “believe God called them to lead others in business and management for the glory of God.” The school attempts to “[ijmpart graduate-level knowledge and skills within a biblical world-view, . . . [i]mpart a balanced view of the Christian life[, and] [h]elp students develop life plans that are consistent with God’s call on their lives and good stewardship of their gifts and talents.” Its masters in business administration program and masters in management program in the nonprofit management track are designed to prepare students to “[implement a comprehensive plan for [their lives] which relates spirituality to work in a way that glorifies Christ,” and to “[h]elp others grow, develop and increase productivity and improve people skills using biblical principles in the power of the Holy Spirit.” In these programs, students are required to take six credits of electives that may come from the School of Divinity, and may include courses such as “Salvation, The Holy Spirit & Christian Living,” and “Birth of the Theocratic Nation.”
Regent’s other schools also reflect a strongly integrated Christian viewpoint. Regent’s School of Government is premised on the view *647 that “[t]he United States of America is a nation founded upon biblical principles,” and it is “the goal of the Robertson School of Government that this heritage be restored, renewed and enhanced in America, and that this heritage also be planted and nurtured in other nations.” Regent’s Center for Leadership Studies is self-described as the “premier leadership-training center for the Christian world,” and it is founded on a “framework grounded in biblical truths.” Scripture is integrated into the Law School curriculum because “a lot of law has come from a biblical perspective.”
Regent’s policy provides that academic freedom is defined in a “context of standards or norms” including:
1. God is the source of all truth. The Scriptures are the written expression of truth and the revealed will of God. There is also natural revelation. Both types of revelation contribute to our understanding of truth.
2. Academic freedom functions within Regent University’s mission statement and its statement of faith. Specifically, within the mission statement, the faculty member takes the role of being a Christian leader in order to model Christian leadership to students. Academic freedom serves to make the university a “leading center of Christian thought and action.” Regent’s vision, “. . . to transform society by affirming and teaching principles of truth, justice and love, as described in the Holy Scriptures, embodied in the person of Jesus Christ, and enabled through the power of the Holy Spirit,” can be achieved only if faculty demonstrate these principles in the classroom.
Regent’s policy provides that “research efforts must be guided by three sources of criteria: the Holy Bible, civil laws and statutes, and the mission of Regent University.”
With respect to its curriculum, each faculty member at Regent is required to include in the syllabus for each class a “description of how the Christian faith and the Bible will be incorporated into the course.” At Regent, “[i]t is desirable that all prospective faculty be proficient in effectively integrating their faith and learning,” and proficiency may be demonstrated “by submitting a paper of an integrative nature or developing course materials that demonstrate appropriate integrative skills and understanding. The dean will review these materials and may consult with a member of the School of Divinity.” *648 Those faculty members who do not demonstrate this proficiency are required to obtain it within three years of hiring by completing one or more of the following activities: a prescribed course of study in “Christian doctrine and/or hermeneutics offered by the School of Divinity, a prescribed reading list on doctrine, hermeneutics and integration, or a lecture and discussion series offered jointly by the School of Divinity and other schools within the University.” Dr. Selig conceded that faculty are expected to “hold tight” to the Statement of Faith, “understand!] the relation between what they teach and what they believe . . . starting, . . . from the Mission Statement or Statement of Faith, and . . . teach students from that perspective.” Regent hires only Christian faculty and staff. Faculty and staff are required to agree with and adhere to Regent’s Statement of Faith. Faculty applicants must submit a statement regarding their “conversion, Christian commitment, and . . . acquaintance with the present-day renewal movement which emphasizes the gifts, fruits and ministries of the Holy Spirit.” This Statement is reviewed by a University official to determine whether an interview is appropriate. Dr. Selig testified that this review is designed to ensure that the applicant adheres to Regent’s characterization of Christianity:
[W]e have had people who have applied who said that they were of a Christian persuasion, but in reading it, we find that they’re not of a Christian persuasion, not what we would call a Christian persuasion. . . . We have people who have applied who say they’re Christians but have many gods, and that’s not what we describe as Christian. . . . We’d rather not have this person arrive here and find out that they didn’t fit.
Although Dr. Selig testified that faculty members are “not required” to attend chapel, and that no punitive sanctions are taken against persons who do not show up for these services, he conceded that Regent “strongly encourages” chapel attendance. According to Regent’s Faculty Handbook, Staff Handbook, Faculty Application, and Staff Application, it is “imperative that Regent University faculty, staff and students . . . maintain an exemplary and involved lifestyle including regular church attendance.” The Employee Handbook states:
Because the purpose of the University is to serve and to glorify the Lord Jesus Christ, it is essential that all members of the University community approach Him as a body to seek His *649 guidance, strength and blessings. Therefore, for approximately thirty minutes at least one day of each week, at or near the noon hour, the University convenes corporately for chapel services. All employees are expected to be in chapel unless specifically exempted by their supervisor.
Furthermore, Regent maintains a tenure system for its faculty members and one of the “Performance Review Criteria for Faculty” is that “because of the unique mission of Regent University ... it is expected that faculty members will exhibit spiritual vitality through their Christian witness, both personally and professionally.” The Faculty Handbook further divides these Performance Review Criteria into three basic areas, one of which includes “[c]onducting student Bible study/fellowship groups and regularly attending chapel.” Additionally, when applying for promotion and tenure, faculty members are required to complete a dossier that includes a “Summary of Christian activities/spiritual vitality, which includes such things as frequency of chapel attendance, participation in staff devotions, home Bible studies, church activity and involvement in other areas where there has been a demonstration of spiritual vitality.”
The question before us then becomes whether, as a matter of law, the trial court correctly applied Code § 23-30.41 (e) to the evidence regarding Regent’s primary purpose. In this respect, it is necessary to determine the meaning of the statutory phrase “religious training or theological education.” The majority interprets “theological education” to mean education preparing “students for vocations associated with ordination, such as rabbi, minister or priest.” In contrast, the majority interprets “religious training” to mean education preparing “students for religious vocations other than those associated with ordination.” Thus, the majority concludes that this phrase refers only to “institutions or departments within institutions” whose “primary function is educating students for religious vocations.”
The majority supports this determination by citing the Report of the Commission on Constitutional Revision (1969)(the Report). In particular, the majority relies on a reference in the Report to a Memorandum submitted by the Association of Independent Colleges, which is contained in the public commentary received by the Commission. See Report at 274 n.39. However, a reading of this material in its full context does not support the majority’s reliance on the quoted portion of the Memorandum. While the quoted portion does appear in the pages referenced in the Report, the pages are not cited, *650 as the majority implies, to clarify the meaning of the phrase “religious training.”
Instead, the Report cites the Memorandum for its factual assertion that nine Virginia colleges within the Association had “some degree of church relationship” but did not “impose[] any religious tests for student admission or faculty selection” or “serve[] primarily a single religious faith.” Report at 274. The Commission thus drew a clear distinction between institutions that do not emphasize their church relationship and those that put strong emphasis on religious faith. Unquestionably, Regent falls in the latter category in that it imposes a religious test for faculty selection and takes religion into account in its student admissions.
The portion of the Memorandum quoted by the majority cites 20 U.S.C. § 751(a)(2) for the distinction drawn in the Memorandum “between a church related college and an institution . . . whose primary function is educating students for religious vocations.” Memorandum at 6. Yet, this distinction appears in the federal statute for the purpose of defining a “school or department of divinity,” namely, as an institution “whose program is specifically for the education of students to prepare them to become ministers of religion or to enter upon some other religious vocation . . . .” 20 U.S.C. § 751(a)(2) (1968) (repealed) (emphasis added).* This portion of the federal statute with its “religious vocation” language does not, as the majority implies, purport to define the broader term “religious training.”
Finally, the distinction in the quoted portion on which the majority relies between “an institution whose primary service is to the state and community and one whose primary service is to a religious or denominational group,” clearly does not support the conclusion that “religious training” as used in Code § 23-30.41(e) refers to education preparing “students for religious vocations other than those associated with ordination.” To the contrary, preparing a student for a religious vocation has an even more limited meaning than is contemplated by the phrase “primary service ... to a religious or denominational group.”
*651 In my view, the majority opinion effectively rewrites Code § 23-30.41(e). The General Assembly’s use of the disjunctive word “or” clearly denotes that “religious training” is not the same as “theological education” within the context of this statute. Moreover, the word “vocation” does not appear anywhere in the statute. It is generally accepted that one’s vocation is the work in which a person is regularly employed and, in context, the term ordinarily does not equate to a professional or occupational status such as that of rabbi, minister, priest, missionary, or director of religious education acquired only through theological education.
Indeed, applying even the narrow interpretation used by the majority and contrary to the majority’s reasoning in footnote 4, the nonclinical M.A. degree in counseling violates the prohibition in Code § 23-30.41(e) because “[t]he goal of the program is not to develop clinical professionals, but to train students who seek to help others within a church/ministry setting.” However, it is clear that the statute does not support the piecemeal analysis resorted to by the majority. Code § 23-30.41(e) refers to an “institution” rather than schools, departments, or programs within an institution. Thus, even though I concur that Regent’s School of Divinity is ineligible to participate in the bond program, Code § 24-30.41(b), the focus of our inquiry should not be a dissection of Regent into its constituent schools and their departments and programs, but an examination of the “primary purpose” of that institution as a whole.
The limitation contained in Code § 23-30.41 (e) is expressed in clear and unambiguous terms. We have repeatedly stated that when the language in a statute is clear and unambiguous, we apply the plain meaning rule. Under this rule, we endeavor to ascertain and give effect to the intention of the legislature from the words used in the statute, unless a literal construction of the statute would yield an absurd result. We may not adopt a construction of the statute that would amount to a holding that the legislature did not mean what it actually has expressed. See generally Earley v. Landsidle, 257 Va. 365, 369-70, 514 S.E.2d 153, 155 (1999); Catron v. State Farm Mutual Auto Insurance Co., 255 Va. 31, 38, 496 S.E.2d 436, 439 (1998); Hubbard v. Henrico Ltd. Partnership, 255 Va. 335, 339, 497 S.E.2d 335, 377 (1998); and City of Winchester v. American Woodmark Corp., 250 Va. 451, 457, 464 S.E.2d 148, 152 (1995).
When so viewed, the language of Code § 23-30.41(e) applies to an institution of higher education whose primary purpose, that is, its principal purpose, is to provide religious training or theological edu *652 cation rather than general secular education. In this context, the statute acknowledges that a particular institution may have only one purpose or some combination of all these purposes. Accordingly, the limiting language of this statute applies only where a particular institution’s primary purpose is religious training or theological education. Theological education is not at issue here. Religious training contemplates teaching religious doctrine to accomplish a particular result. Thus, when an institution’s principal purpose is to teach its particular religious doctrine, and when the institution pursues that principal purpose through its teaching of secular subjects, that institution has as its primary purpose religious training within the meaning of Code § 23-30.41 (e). The record clearly reflects that such is the case with Regent.
While the fact that Regent is a pervasively sectarian institution does not compel the conclusion that its primary purpose is religious training, it is a fact to be considered in the determination required under Code § 23-30.41(e). As the majority has concluded, Regent is a “pervasively sectarian institution[,]” because it is “ ‘an institution in which religion is so pervasive that a substantial portion of its functions are subsumed in [its] religious mission.’ ” Habel v. Industrial Development Authority, 241 Va. 96, 101, 400 S.E.2d 516, 519 (1991)(quoting Hunt v. McNair, 413 U.S. 734, 743 (1973)). Moreover, the record supports the conclusion that Regent is operated in strict conformance with its Mission Statement, Articles of Incorporation, Statement of Faith, and academic freedom policy. Also controlling the operation of Regent are the policies governing faculty and staff as reflected in the Faculty Handbook, Staff Handbook, Faculty Application, and Staff Application, and the requirements of the secular courses offered to sustain Regent’s religious purpose. In short, the record compels the conclusion that Regent’s stated “ultimate purpose,” which is to “glorify[] God and His Son, Jesus Christ,” is indeed its “primary purpose” within the meaning of Code § 23-30.41(e).
On brief, the VCBA contends that if the limitation contained in Code § 23-30.41(e) bars it from participating in the revenue bond program at issue here, that this constitutes impermissible “viewpoint discrimination” under the First Amendment. See Rosenberger v. Rector and Visitors of the University of Virginia, 515 U.S. 819, 839 (1995). Because the VCBA failed to assert this argument in the trial court, the VCBA may not raise that issue for the first time in this appeal. Rule 5:25.
*653 For these reasons, I respectfully dissent from the majority’s holding that the trial court erred in ruling that Regent was ineligible to participate in bond financing under the Educational Facilities Authority Act. Because I would hold that the Act does not permit Regent to participate in this bond program, the issue whether its participation would violate the Establishment Clause is moot. Accordingly, I do not address that issue considered in the majority opinion.

 Although 20 U.S.C. § 751(a)(2) is no longer in effect, the same definition can be found in current statutes, and its limited application is apparent in each. See e.g., 20 U.S.C. § 103(9)(A); 20 U.S.C. § 1062(c)(1); 30 U.S.C. § 1325. Like the federal statute, the Virginia Act at issue here separately excludes “any facility which is used or to be used primarily in connection with any part of the program of a school or department of divinity for any religious denomination.” Code § 23-30.41(b).