**Alexandria**

AMELIA T. HARBIN, widow of

JEROME HARBIN

v.

JAMESTOWN VILLAGE JOINT VENTURE

& AUTOMOBILE INSURANCE COMPANY

OF HARTFORD

No. 1310-92-4

Decided April 6, 1993

COUNSEL

Michael W. Heaviside (Ashcraft & Gerel, on brief), for appellant.

Frances G. Marrin (Law Offices of Conrad A. Fontaine, on brief), for appellees.

OPINION

**BENTON, J.**—Amelia T. Harbin, widow of Jerome Harbin, appeals from a decision by the commission that Harbin, who had been employed by Jamestown Village Joint Venture, was not in the course of his employment when he was killed by an automobile while crossing a street. She contends that the commission erred when it held that neither the special errand doctrine nor the extended premises doctrine was applicable. We conclude that the special errand doctrine applied to the facts of this case, and we reverse the commission's denial of benefits.

## I.

The material facts, which are largely undisputed, proved that Jerome Harbin was sixty-six years old when he was killed on December 1, 1989. At the time of his death, Harbin worked for Jamestown as a renovation coordinator. His duties involved completing and supervising kitchen and bathroom renovations at various apartments being renovated by Jamestown. The place to which he would report for employment depended upon which building was then being renovated. Each renovation would take two to six months, depending on the size of the project. At the time of his death, Harbin's regular work site was at the Executive North Apartments in Virginia.

James Kostyk, Harbin's supervisor, testified that, in 1989, Jamestown was renovating apartment projects throughout northern Virginia. However, Jamestown had proposed for the first time to renovate thirteen buildings in the District of Columbia. The District of Columbia required a series of thirteen public hearings before Jamestown could begin renovation of those buildings. Six of Jamestown's employees, including Harbin, were designated to attend the hearings in the District of Columbia on various days in the summer and fall of 1989. Kostyk said the hearings were "special" events that Harbin had to attend because Jamestown needed to participate in the hearings in order to do work in the District of Columbia.

Before the first hearing, Kostyk suggested that the employees meet at his office in the Crystal City office complex and take the subway to the hearing site. Most of the employees, including Harbin, continued to assemble at Kostyk's office on the mornings they were required to attend the 9 a.m. hearings. One or two of the employees on occasion went to the hearings later in the day, depending on their other work obligations.

On the morning of December 1, 1989, Kostyk arrived at his office shortly after 7 a.m. and noticed that Harbin was not present. He and four other employees waited until 8:10 a.m. and then departed. However, Kostyk was concerned because Harbin was not at his office that morning. Although Kostyk had advised the employees that, "based on their duties . . . or job requirements, . . . they were free to meet" him in the District of Columbia, Harbin always went to Kostyk's office to depart and was usually there before Kostyk arrived. After waiting for Harbin, Kostyk departed without him because the subway ride took an hour.

Harbin's widow testified that Harbin left home between 6:00 and 6:30 a.m. for his rendezvous in Kostyk's office. The record shows that Harbin parked his car on the premises of an apartment complex several blocks from Kostyk's office building. Harbin had previously done renovation work at the apartment site where he parked and had a parking permit. Kostyk testified that Jamestown permitted Harbin to park in that lot.

The evidence suggests that Harbin walked south from the apartment site to the intersection of 23rd Street and Route 1. Harbin had to traverse Route 1, a major, busy thoroughfare, to get to Kostyk's office from the parking lot. According to the investigating police officer, the

traffic lights were positioned in a way that made them difficult for pedestrians to see. Also, the pedestrian light was about 100 feet away from the point at which a person would have started to cross Route 1 from the west side of its intersection with 23rd Street. Darnell Corbin, an eyewitness to the accident, stated that, because of the sequence of the traffic lights at that intersection, a pedestrian could not cross all the lanes on Route 1 during one green light. According to Corbin, who was standing on the median strip of Route 1, Harbin was crossing the southbound portion of Route 1 and was struck by a motor vehicle travelling south just before he reached the median strip at a point ten to twenty feet south of the crosswalk. The traffic light was green for southbound vehicles. Witnesses testified that when Harbin crossed Route 1, he was looking down and seemed preoccupied.

On this evidence, the deputy commissioner found that "at the time of his accident the deceased was not enroute to his usual job site at Executive Apartments, but rather, was enroute to a special meeting where his appearance was required by the employer." Therefore, the deputy commissioner held that Harbin's activities arose out of and were in the course of his employment. The deputy commissioner found, however, that because Harbin crossed the street against the traffic light and out of the pedestrian crossing lane, Harbin committed an act of willful misconduct. Thus, his widow was barred from an award of benefits arising from his death. On review, the full commission held that Harbin was going to work when he was injured and, thus, "was not in the course of his employment when he sustained his injuries." The commission concluded that Harbin was not on a special errand because the meetings occurred during his usual working hours and they were a part of his particular employment.

## II.

The special errand rule is an exception to the usual rule that an injury which occurs to an employee while going to or coming from work is not compensable if it occurs off the employer's premises. 1 Arthur Larson, *Workmen's Compensation Law* § 16.11 n.8 (1992).

The special errand rule may be stated as follows: When an employee, having identifiable time and space limits on his employment, makes an off-premises journey which would normally not be covered under the usual going and coming rule, the journey may be brought within the course of employment by the fact that the trouble and time of making the journey, or the special

inconvenience, hazard, or urgency of making it in the particular circumstances, is itself sufficiently substantial to be viewed as an integral part of the service itself.

*Id.* (footnotes omitted).

The commission has adopted and employed the special errand rule as an exception to the going and coming rule in cases arising under the Workers' Compensation Act. *See Rogers v. Beneficial Finance Co.*, 52 O.I.C. 216 (1970); *Holland v. Amherst County School Board*, 52 O.I.C. 142 (1970). In *Holland*, several teachers were injured in an automobile accident while going home from a teachers' conference in a neighboring city. The teachers were awarded benefits even though the incident occurred on a day when the teachers otherwise would have been at school but for the school board's encouraging teachers to attend conferences. 52 O.I.C. at 144. The decision noted that attendance at meetings was "[o]ne of the special covenants attached to the contract of employment of the teachers." *Id.* at 143.

The commission's rulings in *Rogers* and *Holland* are consistent with "special errand" cases from other jurisdictions. In *Edens v. New Mexico Health & Social Services Dep't*, 89 N.M. 60, 547 P.2d 65 (1976), the decedent was required by her employer to attend an out-of-town conference with other employees. After decedent had returned from the conference, dropped off the co-employees, and started home, she was killed in an accident. In allowing benefits, the court held:

> "[W]hen an employee is sent by his employer on a special mission away from his regular work; or by the terms of his contract of employment he is burdened with a special duty incidental to, but aside from the labor upon which his wages are measured; while on such mission, or in the performance of such duty, the employee is acting within the course of his employment; notwithstanding no wages or remuneration is specified as applicable to such mission or duty; and notwithstanding an automobile is required for such performance which is furnished by the employee without cost to the employer. If an employee is accidently injured while on such mission, or in the performance of such duty, the injury arises out of and in the course of his employment."

*Id.* at 62, 547 P.2d at 67 (quoting *Wilson v. Rowan Drilling Co.*, 55 N.M. 81, 94, 227 P.2d 365, 373 (1950)).

In *Junium v. A.L. Bazzini Co.*, 86 A.D.2d 690, 690, 446 N.Y.S.2d 520, 521 (1982), the Court held that "[w]hile the general rule is that risks of travel to and from work are not incidents of employment, an exception exists for employees directed to perform a special errand or service for their employer." That the errand was required to be performed on a regular work day or at the time the employee would otherwise be at the employee's regular post was held to be irrelevant. *Id.* Moreover, that the employee was not compensated for travel from home to the place where the special errand was to be performed generally is immaterial to recovery. *See Winn-Dixie Stores, Inc. v. Smallwood*, 516 So. 2d 716, 718 (Ala. Civ. App. 1987). *See also* 1 Arthur Larson, *supra,* § 16.23.

Although Harbin had an arrangement, however informal, that he would meet his supervisor and then journey from his supervisor's office to the hearings in the District of Columbia, Harbin was not on a personal journey. This arrangement was initiated or tacitly approved by Kostyk, Harbin's supervisor. *See Smallwood*, 516 So. 2d at 719. Ordinarily, an employee on a special errand has the right to assume that he may act in accordance with the pattern established by his supervisor or other superior employee under whom the employee works. *See Delozier v. Munlake Constr. Co.*, 657 S.W.2d 53, 57 (Mo. Ct. App. 1983).

The evidence further proved that these thirteen meetings in the District of Columbia were not a regular part of Harbin's employment. In the seven years that Harbin worked under Kostyk's supervision, he had not been required to make appearances at any such meetings. Kostyk testified that Jamestown had not previously renovated apartments in the District of Columbia and that the series of meetings was held to satisfy the governmental requirements for renovation. Harbin's usual job was described to be actual renovation of kitchens and bathrooms in apartment buildings in Virginia. Indeed, he usually wore a uniform shirt with his employer's logo on the pocket.

Kostyk stated that, although Harbin was not comfortable attending the hearings and giving testimony, he was asked to attend the hearings in the District of Columbia so that he would be available to answer questions as a convenience to Jamestown. On these occasions, Harbin wore a suit and necktie, not his usual work attire. No evidence proved that Harbin's attendance at these hearings was a normal or usual incident of his employment. The "special errand" rule applies if the employee is given "a temporary, special assignment . . . [which]

was outside the normal performance of [the employee's] duties, and it clearly represented a special benefit to the [employer]." *Ream v. L.E. Myers Co.*, 72 Mich. App. 238, 242, 249 N.W.2d 372, 374 (1976).

In summary, Harbin was required to attend an off-premises meeting at the discretion of his employer. When an employee is required by the employer to be away from the employer's place of employment, the employee is deemed to be in the course of employment because the employee is engaged in the direct performance of duties assigned by the employer. Harbin was within the scope of his employment assignment from the moment he left home until he returned either to the regular premises of his employment or to his home. *Id.*

### III.

■ "Negligence, regardless how gross, does not bar a recovery for workers' compensation benefits." *Uninsured Employer's Fund v. Keppel*, 1 Va. App. 162, 165, 335 S.E.2d 851, 852 (1985).

Willful misconduct requires something more than negligence. " 'Willful' . . . imports something more than a mere exercise of the will in doing the act. It imports a wrongful intention." One of the salutary purposes of worker's compensation acts is to provide specified benefits for injuries arising out of and in the course of employment regardless of fault of the employer or employee, except instances of willful misconduct or intentional injury. The common law defense of contributory negligence is abolished by the Act.

*Id.* at 164, 335 S.E.2d at 852 (citation omitted). Evidence of a hazardous act involving obvious danger, without more, does not prove more than negligence.

The deputy commissioner stated that

Harbin ought to have known the statutory provisions pertaining to the right of way of drivers versus pedestrians at intersections controlled by lights, pedestrian signals and crosswalks. He chose not to cross . . . the street at the intersection which was not only the appropriate, but also the logical place for him to have crossed a busy highway. That he did disqualifies the awarding of compensation benefits arising from his death.

This statement, as a summation of the evidence, established only negligence. Nothing in the record tends to prove Harbin had a wrongful

intention in crossing the street when and where he did. The evidence proved that the traffic control lights were positioned so that pedestrians could not easily see them. The pedestrian signal was 100 feet from the west side of Route 1. Moreover, the light sequences were such that a pedestrian could not traverse Route 1 on one sequence. Harbin was sixty-six years old and wore eyeglasses. Viewed in the light most favorable to Jamestown, the evidence proved negligence but failed to prove the willfulness required for denial of benefits.

Accordingly, we reverse the commission's denial of benefits and remand the case for entry of an award.

*Reversed and remanded.*

Bray, J., and Fitzpatrick, J., concurred.