Present: All the Justices

DANIEL F. P. STONE

                                      OPINION BY
v.  Record No. 000175    CHIEF JUSTICE HARRY L. CARRICO
                                November 3, 2000

DOOR-MAN MANUFACTURING CO., ET AL.


           FROM THE CIRCUIT COURT OF THE CITY OF NORFOLK
                   Junius P. Fulton, III, Judge

     The question for decision in this appeal is whether a

worker in the employ of the owner of a manufacturing

business was a statutory fellow employee of the architect

and contractors involved in a construction project at the

owner's plant.  The question arose in a personal injury

action brought by the plaintiff, Daniel F. P. Stone

(Stone), an employee of the Ford Motor Company (Ford) at

its motor vehicle assembly plant in Norfolk, against the

defendants, Gala & Associates, Inc. (Gala), the

architectural firm involved in the project, and

Rudolph/Libbe, Inc. (Rudolph/Libbe), Door-Man Manufacturing

Co. (Door-Man), Lake Erie Electric, Inc. (Lake Erie), and

E. G. Middleton, Inc. (Middleton), the contractors and

subcontractors involved in the project.

     The defendants filed motions to dismiss for lack of

subject matter jurisdiction, alleging that Stone's sole

remedy was provided by the Workers' Compensation Act (the

Act).[1]  Finding that the defendants were engaged in the trade, business, or occupation of Ford and, consequently, were deemed to be statutory fellow employees of Stone, the trial court held that Stone's personal injury action was barred by the exclusivity provision of the Act and sustained the defendants' motions to dismiss.  We awarded Stone this appeal.

At the time he was injured on April 11, 1996, Stone was employed as a utility upgrader at Ford's assembly plant.  While operating a "tow-motor vehicle" or "tug" in the course of his employment, Stone attempted to drive through the doorway of the body shop where he worked.  However, the overhead door "unexpectedly closed and struck [him] in the head and chest," paralyzing him from the mid-chest down.

The door in question was opened and closed automatically by a device activated by electrical "inductive loops."  One loop was installed in the concrete floor immediately inside the shop door and another in the concrete ramp immediately outside the door.  Stone claimed the loops were incorrectly positioned with the result that

---

[1] Rudolph/Libbe states in a memorandum found in the appendix that "[i]t is uncontested [Stone] in this matter has been paid benefits pursuant to the Virginia Workers'

2

when he attempted to exit the shop through the open doorway at an angle, rather than head-on, the inside loop failed to detect the presence of his tug and to activate the device that would have kept the door from descending.

The door and the body shop were located in a former warehouse that had been remodeled and enlarged during a renovation of the assembly plant undertaken by Ford in 1994 to implement the manufacture of its redesigned F-150 pickup truck. Completed several months before Stone's accident, the new body shop was one phase of a five-phase project.[2] Designated the "PN96 Body Shop Project," the proposal for development of the shop had been the subject of an eighteen-month effort by Ford personnel to prepare a layout, together with "global specifications," showing "exactly how this building should be shaped; how all the toolings are going to fit inside; how the material is going to be brought in; how the material is going to be arranged together; and how it's going to be shipped from point A to point B."

Ford then entered into a contract with Gala for "Engineering Services for [the] Body Shop Building

---

Compensation Act." This fact is not otherwise disclosed in the record.

[2] Rudolph/Libbe states on brief that the body shop was a $25 million phase "of the total $125 million project."

3

Addition."  Gala's services were to consist, <u>inter</u> <u>alia</u>, of the review of "new proposed layout" and "construction shop drawings" as well as the preparation of "complete design and bid documents for bid purpose," "complete specifications," and "as-built drawings."  Stone claimed in his motion for judgment that Gala negligently designed the body shop and the overhead door system, negligently supervised and inspected the installation of the system, and negligently approved or failed to disapprove the design of the system, proximately causing Stone's injuries.

Rudolph/Libbe won the bid and was awarded the contract for construction of the body shop.  In what was termed a "Full Service Contract," Rudolph/Libbe as "Contractor" agreed to "furnish all materials, tools, equipment, facilities, labor, means, supervision and management to perform all work required to investigate, study, design, detail, fabricate, deliver, construct, install, launch and document this new PN96 Body Shop project . . . in strict accordance with the Owner's Instructions to Bidders, Project Specifications, Project Timing and Standard Specifications."

Specifically, Section 08200 of the Full Service Contract, termed "<u>Vertical Lift Doors</u>," provided for the furnishing of "all materials, equipment and labor necessary

4

to provide and install new vertical lift doors at docks and ramps" and the submission of "complete shop drawings showing details of construction, fabrication and installation of all components for all work." Section 08200 also specified the use of a vertical lift door "as manufactured by" Door-Man and one other supplier. Stone claimed Rudolph/Libbe negligently installed the door system, negligently supervised the design, manufacture, and installation of the system by others, failed to inspect and/or negligently inspected the system, and failed to test and/or negligently tested the system, proximately causing Stone's injuries.

Rudolph/Libbie entered into a subcontract with Door-Man, requiring the latter to furnish and install the door that was later involved in Stone's injury. Door-Man manufactured the door, but subcontracted with another firm, not a party to this proceeding, to perform the actual installation. Stone claimed that Door-Man negligently breached its duties to design, manufacture, distribute, sell, install, inspect, and test the overhead door system, breached its express and implied warranties that the system was of good merchantable quality fit for its ordinary purposes and knew or had reason to know the particular purpose for which the door was being purchased, yet

5

breached its implied warranty that the door was fit for its particular purpose, proximately causing Stone's injuries.

Rudolph/Libbie also entered into a subcontract with Lake Erie to perform the electrical work in connection with the installation of the door involved in Stone's injury. Lake Erie then subcontracted with Middleton for the actual performance of the electrical work. Stone claimed that Lake Erie and Middleton negligently installed the door system and its wiring and, after installation, failed to test and/or negligently tested the system, proximately causing Stone's injuries.

Stone also claimed that all the defendants: (1) failed to instruct the users of the door system how to operate it safely, (2) failed to warn the users of the dangers inherent in the design and manufacturing of the system, and (3) failed to warn the users of the risk of injury when using the system in a reasonably foreseeable manner and for its intended purpose, proximately causing Stone's injuries. Stone moved for entry of judgment jointly and severally against all defendants in the sum of $30 million compensatory damages and $350,000 against each defendant in punitive damages.

As noted supra, the trial court found that because the defendants were engaged in the trade, business, or

6

occupation of Ford and, consequently, were fellow statutory employees of Stone, his personal injury action was barred by the Act's exclusivity provision.  All the defendants contend this finding was correct and should be affirmed.

The exclusivity provision is found in Code § 65.2-307, which reads as follows:[3]

> The rights and remedies herein granted to an employee when his employer and he have accepted the provisions of this title respectively to pay and accept compensation on account of injury or death by accident shall exclude all other rights and remedies of such employee, his personal representatives, parents, dependents or next of kin, at common law or otherwise, on account of such injury, loss of service or death.

The exclusivity provision does not apply, however, to a common law action for an employee's injury or death against an "other party."  Code § 65.2-309; Stewart v. Bass Constr. Co., 223 Va. 363, 365, 288 S.E.2d 489, 490 (1982).

"The issue whether a person is a statutory employee presents a mixed question of law and fact which must be resolved in light of the facts and circumstances of each case."  Cooke v. Skyline Swannanoa, Inc., 226 Va. 154, 156, 307 S.E.2d 246, 247 (1983).  Where, as here, the facts relevant to resolution of the jurisdictional issue are not in dispute, "we must determine whether the trial court correctly applied the law to those facts."  Cinnamon v.

7

International Bus. Mach. Corp., 238 Va. 471, 474, 384 S.E.2d 618, 619 (1989).

"As a general rule, the several trades involved in construction work are not part of the business of manufacturing products for sale."  Id. at 478, 384 S.E.2d at 621.  "Every manufacturer must have a plant, but this fact alone does not make the work of constructing a plant a part of the trade or business of every manufacturer who engages a contractor to construct a plant."  Raines v. Gould, Inc., 343 S.E.2d 655, 659 (S.C. Ct. App. 1986).

To support their contention that they were engaged in the trade, business, or occupation of Ford, the defendants emphasize the evidence concerning Ford's eighteen months of intensive planning for the construction project as well as the detailed layout and "global specifications" that were developed as a result.  The defendants also cite evidence showing that, at its assembly plant, Ford employs personnel trained to design buildings as well as approximately 250 skilled tradesmen, including carpenters, electricians, pipefitters, millwrights, welders, plumbers, and others.

Each defendant says the evidence showed that Ford, with its own employees, normally performs work at its plant

---

[3] Code § 65.2-307 was amended in 1999 to add a new paragraph, inapplicable here.  1999 Va. Acts ch. 842.

8

similar in all respects to the construction work required of the particular defendant in the contractual arrangements for the project in question. In addition, some of the defendants cite Ford's involvement in the day-to-day construction of the project as evidence they were involved in Ford's usual business.

For example, Gala, the architect, asserts that Ford "has made and continues to make the design of its production facilities an integral part of its 'normal' trade, occupation or business and that it did so with respect to the design work on the new body shop in Norfolk." On "the very door in question," Ford "produced and required adherence to a detailed, six page specification with respect to door design and operation."

Rudolph/Libbe, the construction contractor, maintains that "Ford employs personnel who are capable of and regularly perform the type of tasks contracted to Rudolph/Libbie in this matter, and in fact Ford's personnel provided supervisory instruction on a daily basis to the contractors on this job, including Rudolph/Libbe." Ford even "specified that the external actuating loop [for the door in question] be moved further from the door," and, after Stone's accident, "Ford's own construction forces at

the Norfolk Plant added a second inductive loop on the inside of the door in question."

Door-Man, the manufacture and installation subcontractor, submits that Ford "manufactures its own vertical lift doors at various Ford facilities" and "has installed automatic opening doors at the Ford Plant." "Ford was actively involved in all phases of the PN-96 project, including the design, construction and installation of the body shop and its components and particularly the overhead door involved in this case. Ford dictated the size of the door, where it was to be placed, the location of the inductive loop used to operate the door as well as the location of the guard post adjacent to the door."

Lake Erie, the electrical subcontractor, states that "Ford electricians regularly perform the same work which Lake Erie Electric was contracted to perform as part of the [body shop] expansion. They have removed and replaced door loops, relocated electric panels, and worked on the timing and sequencing of doors."

Middleton, the electrical sub-subcontractor, claims that it "installed the electrical components to [the] overhead door for use in Ford's plant" and that it is unrefuted that Ford "routinely engaged in such work on its own" with the "80-85 full time electricians" it employed at

10

the plant. "In short, all of Middleton's work, with respect to this particular door, is also performed by the Ford electricians in house."

Furthermore, in the arguments of the defendants, there is an attempt by each to minimize its role in the construction project, to isolate itself from the parts played by other defendants, and to have us focus our attention upon its own individual undertaking. To the extent that these arguments are intended to shift blame for Stone's accident, they deal with the question of liability and hence are irrelevant to the issue whether Stone is the defendants' statutory fellow employee. To the extent that the arguments are intended to individualize our resolution of the statutory employee issue by reference to each contract separately, we reject them. In determining whether the defendants were engaged in the trade, business, or occupation of Ford, rendering Stone a statutory employee, we think the contractual obligations of the parties should be considered as a whole and the construction of the body shop as a single project.

There is also an attempt on the part of some defendants to characterize Ford as its own general contractor and Rudolph/Libbe as a mere subcontractor. However, the obligations imposed upon Rudolph/Libbe by the

language quoted above from the "Full Service Contract"

clearly make Rudolph/Libbe the general contractor on the

PN96 Body Shop Project.

With respect to the law applicable to the case, there

is a lack of agreement among the parties concerning the

appropriate test to be applied in resolving the issue

whether Stone was a statutory employee.  Three separate

tests are discussed in the briefs, the "normal work" test,

the "subcontracted fraction" test, and the "stranger to the

work" test.

The first, the "normal work" test, was recognized in

Shell Oil Co. v. Leftwich, 212 Va. 715, 187 S.E.2d 162

(1972).  That case involved two workers employed by a

lessee of a service station owned by Shell Oil Co.  We held

the workers were not the statutory employees of Shell Oil,

stating as follows:

> "[T]he test is not one of whether the
> subcontractor's activity is useful, necessary, or even
> absolutely indispensable to the statutory employer's
> business, since, after all, this could be said of
> practically any repair, construction or transportation
> service.  The test (except in cases where the work is
> obviously a subcontracted fraction of a main contract)
> is whether this indispensable activity is, in that
> business, normally carried on through employees rather
> than independent contractors."

Id. at 722, 187 S.E.2d at 167 (quoting 1A Arthur Larson,

The Law of Workmen's Compensation § 49.12 (1973)).

12

The "normal work" test of Shell Oil has been discussed numerous times in our subsequent decisions, but none involved the situation presented here, where the question is whether a worker employed by an owner is a statutory fellow employee of contractors and subcontractors engaged to do construction work.[4]  Closely analogous, however, is Whalen v. Dean Steel Erection Co., 229 Va. 164, 327 S.E.2d 102 (1985), where the issue was whether a worker employed by a general contractor may bring a tort action against a subcontractor for personal injuries caused by the subcontractor's negligence on the job.  The worker argued for application of the "normal work" test as enunciated in Shell Oil and applied in Bassett Furniture Indus., Inc. v. McReynolds, 216 Va. 897, 224 s.E.2d 323 (1976) as well as Southeastern Tidewater Area Manpower Auth. v. Coley, 221 Va. 859, 275 S.E.2d 589 (1981).

We said that the worker "misapplies these authorities."  Whalen, 229 Va. at 170, 327 S.E.2d at 105. These cases, we continued, involved the question "whether a subcontractor's employee, injured by a general contractor's

_____

[4] Two cases decided since Shell Oil, Williams v. E. T. Gresham Co., 201 Va. 457, 111 S.E.2d 498 (1959), and Stewart v. Bass, 223 Va. 363, 288 S.E.2d 489 (1982), involved claims by an employee of an owner but the "normal work" test is not mentioned in either opinion.  Both were

13

(or owner's) negligence on the job, may sue such general contractor or owner at common law or whether such general contractor or owner has become the statutory employer of the plaintiff."  Id., 327 S.E.2d at 106.  "These statutory employer cases," we stated, "present a question which is the obverse of the one presented here, and their rule is inapplicable where a general contractor's employee seeks to sue a subcontractor."  Id.  (Emphasis added.)

The second test discussed in the briefs is the "subcontracted fraction" test, derived from the parenthetical language in the quotation from Professor Larson's work.  This language excepts from the "normal work" test those "cases where the work is obviously a subcontracted fraction of a main contract."  However, in Cinnamon v. International Bus. Mach., supra, we said of the "subcontracted fraction" test:

> In the context of the construction business, it relates to a general contractor, the party obligated by the main contract with the owner to complete the whole project.  If the work out of which the accident arose was, in the language of Shell Oil, "obviously a subcontracted fraction of [that] contract" and, in the language of the statute, "not a part of the trade, business or occupation of" the owner, the general contractor who engaged the subcontractor to perform that fraction is the statutory employer of the injured worker, whether directly employed by the primary subcontractor or by a secondary subcontractor.

---

decided under the "stranger to the work" test, discussed infra.

14

238 Va. at 476, 384 S.E.2d at 620 (emphasis added).[5]  Hence,

the "subcontracted fraction" test does not relate to the

situation involved here, where the employee of an owner,

not a subcontractor, is the injured worker.[6]

The third test is the "stranger to the work" test.

This test is derived from the language of Code § 65.2-

309(A), noted above, which recognizes the right of an

injured worker to maintain a common law action for personal

---

[5] The reference in the quotation to "the statute" is to Code § 65.2-302(B), which specifies when a general contractor becomes a statutory employer, making him liable for compensation under the Workers' Compensation Act for a worker's injury or death.

[6] Rudolph/Libbe cites Evans v. Hook, 239 Va. 127, 387 S.E.2d 777 (1990), as "instructive on [the] issue" whether "Ford subcontracted out a fraction of the PN-96 Project to Rudolph/Libbe and the other defendants herein." Rudolph/Libbe says that "[i]n Evans, this Court found that a contractor building a building to be used as a used car dealership was in the same business trade or occupation as the used car dealer."  Rudolph/Libbe misreads the case. The owners in that case were not in a used car dealership but a partnership formed for the purpose of acquiring, owning, and developing a tract of land on which it planned to construct a building "to rent to a car dealer."  Id. at 129, 387 S.E.2d at 777.  An employee of a contractor engaged to construct the building was injured during the course of construction and sued the masonry subcontractor and the architect who designed the building and supervised the construction.  The trial court sustained pleas to the jurisdiction.  The employee appealed only the judgment in favor of the architect. We affirmed.  Contrary to the way Rudolph/Libbe reads the case, we did not find that the architect was "in the same business trade or occupation as the used car dealer" but that he was engaged in the same "business or project" as the owners of the property, i.e., land development.  Id. at 131, 387 S.E.2d at 779.

15

injury against an "other party."  This is the test we applied in Whalen, supra, after we ruled that the "normal work" test is inapplicable when an employee of a general contractor makes a personal injury claim against a subcontractor.

The worker in Whalen, a carpenter employed by the general contractor on a construction project, was engaged with a crew in fabricating wooden forms into which concrete would be poured.  The crew was also responsible for installing reinforcing steel and pouring concrete into the forms, then setting anchor bolts in the concrete, to which vertical steel columns would later be attached.  At the time the worker was injured, his crew was working at the construction site simultaneously with the crew of a subcontractor engaged to do the steel erection work.  The subcontractor had stored a steel girder at the site, which fell over and injured the worker.  He brought a tort action against the subcontractor.

In Whalen, applying the "stranger to the work" test, we held that the worker's action was barred.  229 Va. at 169, 327 S.E.2d at 105.  We stated that the steel subcontractor "was no stranger to the work in which [the worker's] employer was engaged, but was, on the contrary,

16

performing an essential part of it."  Id.  (Emphasis added.)

As noted in Whalen:

"The test to be applied in the present case was first stated in Feitig v. Chalkley, 185 Va. 96, 38 S.E.2d 73 (1946).  There we said that in order to maintain a common law action the defendant had to be a stranger to the trade, occupation, or business in which the plaintiff was involved.  This test has been restated and applied numerous times.  See, e.g., Stout v. Onorati, 221 Va. 143, 267 S.E.2d 154 (1980); Bosher v. Jamerson, 207 Va. 539, 151 S.E.2d 375 (1966); `Administratrix v. Ford, 198 Va. 712, 96 S.E.2d 92` (1957); Sykes v. Stone & Webster Eng. Corp., 186 Va. 116, 41 S.E.2d 469 (1947)."

229 Va. at 167, 327 S.E.2d at 104 (quoting Stewart v. Bass, supra, 223 Va. at 365, 288 S.E.2d at 490) (employee of pulp manufacturer, injured by a crane while removing for repair an aerator used in manufacturing process, barred under the "stranger to the work" test from maintaining personal injury action against owner of crane who regularly assisted manufacturer in removal of aerators).  See also Williams v. E. T. Gresham Co., 201 Va. 457, 111 S.E.2d 498 (1959) (employee of ferry district injured while repairing dock facilities barred from maintaining personal injury action against owner of pile driving equipment regularly engaged to assist in such work).

We said in Feitig v. Chalkley:

The remedies afforded the employee under the act are exclusive of all his former remedies within the field

17

of the particular business, but the act does not extend to accidents caused by strangers to the business. If the employee is performing the duties of his employer and is injured by a stranger to the business, the compensation prescribed by the act is available to him, but that does not relieve the stranger of his full liability for the loss . . . .

185 Va. at 102, 38 S.E.2d at 75-76 (emphasis added).

We think the "stranger to the work" test applied in Whalen is the appropriate test for application to the present case. Although the injured worker in Whalen was the employee of a general contractor while the employee of an owner is the injured claimant in this instance, the latter stands on at least an equal legal footing with the former.

Here, combining the language in Whalen and Feitig and applying the holdings to this case, we find that "the work in which [Stone's] employer was engaged" was Ford's "particular business" of manufacturing and selling motor vehicles. The defendants were strangers to that business. Therefore, the Act does not bar Stone's common law action for personal injuries against the defendants.

However, we would reach the same result even if we applied the "normal work" test. Although Ford engaged in a protracted period of intensive planning for the construction project and exercised a degree of supervision in the course of construction, this is not atypical conduct

18

for an owner, especially one engaged in an undertaking of the scope and size of the PN96 Body Shop Project. And it is not unusual for an owner to make changes as a project progresses, as Ford did here when it "recommended" a relocation of the outside inductive loop.

Nor do we think it is of significance that Ford itself corrected the location of the interior inductive loop after Stone was injured. This action may have been prompted by Ford's concern for the safety of its employees and its unwillingness to trust the correction to others.

With respect to design work, it is true that Ford previously used its own personnel to do the design work for construction projects and still does on "smaller . . . or mid-sized projects." However, "on a major project like [the PN96 Body Shop]," Ford "use[s] the outside help such as [Gala]," which works "with Ford Motor Company exclusively."[7]

Furthermore, while Ford employs a sizeable number of skilled tradesmen on a permanent basis, the evidence shows that these tradesmen "are mainly concerned with

---

[7] Although Gala may work "with Ford Motor Company exclusively," Gala is not Ford's exclusive designer on major projects. Gala states on brief that "[o]nly for 'larger' projects like the PN-96 Project does Ford 'outsource' some of the design work to Gala." (Emphasis

maintenance." Although, in certain instances, they "build things as well," including vertical lift doors similar to the one that caused Stone's injury, we consider it significant that "plant forces" performed "no construction phase" of the PN96 Body Shop Project.

The "magnitude of the job" determines whether Ford does the work with its own employees or engages outside contractors. If the magnitude of the job is greater than Ford's employees can accomplish or if the cost of a job exceeds one million dollars, outside contractors are engaged to do the work. The renovation project in question was the type of "major work" that Ford "historically contracted out." In other words, Ford's normal work indisputably did not include in-house performance of projects of the scope and size of the PN96 Body Shop Project. While the magnitude of the project is not conclusive, it is entitled to consideration in determining whether the construction of the project was the normal work of Ford and in reaching the conclusion that it was not.

For the foregoing reasons, we will reverse the judgment of the trial court, reinstate Stone's motion for judgment, and remand the case for further proceedings.

_____

added.) Even then, Gala apparently has to bid on the design work, like anyone else.

<u>Reversed and remanded</u>.