## CIRCUIT COURT OF THE CITY OF PORTSMOUTH

Jeffrey Fose

v.

Gwaltney of Smithfield, Ltd.

May 31, 2005

Case No. (Law) 02-3759

By Judge Mark S. Davis

This matter is before the Court on defendant's plea in bar based upon the exclusivity provisions of the Virginia Workers' Compensation Act contained in Virginia Code § 65.2-307. The factual and procedural background of the case, discussion of the issues and conclusions are set forth below.[1]

### I. Factual and Procedural Background

Plaintiff, Jeffrey Fose, alleges in his Motion for Judgment that, "on or about August 5, 2000, [he] was engaged in his duties as an employee of Coastal Fire Protection and was on the premises of Gwaltney of Smithfield, Ltd., to effect maintenance and or repairs to the fire detection/sprinkler system," and that, as a direct result of the negligence of Gwaltney of Smithfield, Ltd. ("Gwaltney"), in failing to properly maintain its walkway free

---

[1] Plaintiff is represented by W. Mark Broadwell, Esquire, with the law firm of Forbes and Broadwell, and Defendant is represented by J. Derek Turrietta, Esquire, with the law firm of Stackhouse, Smith and Nexsen.

of slippery substances, as he "was walking into the plant to make repairs and while carrying an 'A' frame ladder, he slipped on the walkway, fell to the surface, and was caused to sustain serious and permanent injuries." Gwaltney filed a plea in bar in response to plaintiff's motion for judgment, asserting that plaintiff is Gwaltney's statutory employee and therefore his exclusive remedy for his injury is a claim for workers' compensation benefits under the Virginia Workers' Compensation Act. In support of its plea, Gwaltney presented evidence from several individuals at the hearing. The Court here reviews that evidence somewhat colloquially, as it was delivered, in an effort to preserve the context of such evidence.

Garland Brock testified first. Brock was the plant engineer for the Gwaltney Plant in Portsmouth at the time the plaintiff was injured. Brock was terminated after the August 5, 2000, accident, but before his testimony at the March 11, 2005, hearing. Brock testified that, at the time of the injury, he had approximately sixty maintenance employees under his supervision at the Portsmouth Plant, of which nine were supervisors. These maintenance employees would routinely check and replace valves on the miles of pipe located in that plant. Those pipes included pipes that were used for gas, ammonia, steam, air, vacuum, water, hot water, and sewage.

Brock testified that, at times, it was necessary for him to take bids on projects for contractors to come in and perform work at the plant. Brock had the authority to hire these contractors to perform any work that was required to be performed outside the scope of the work of his maintenance department. Brock testified that some of these outside contractors would actually use Gwaltney's pipe and valves when they were performing such work. Brock stated that his maintenance staff did repair the pipes located at the plant, but they did not on a regular basis install pipes. He elaborated to say that his maintenance staff did not install sprinkler systems, ammonia systems, or steam lines for other similar systems. However, he said that the maintenance staff would repair non-sprinkler waterlines and occasionally move them when necessary. On cross-examination, Brock indicated that the purpose of the plant was to process meat such as hotdogs, bolognas, sausages, salamis, etc. These pre-processed meats would come into the plant where they would be further processed, cooked, chilled, and packed. Brock indicated that the plant employed 500 employees, of which the sixty previously referenced were under his direct control. Brock testified that, sometime in 2000, plaintiff's direct employer, Coastal Fire Protection ("Coastal"), began providing fire suppression services to the Gwaltney plant. These fire suppression services, in the form of sprinkler system work, were necessary to insure that the system could pass the code. He also said the fire suppression work performed by Coastal was performed pursuant to a contract.

Separate and apart from the fire suppression contract, a renovation project was taking place in August 2000 in the retail pack floor (or packing floor) section of the plant. Brock coordinated the work on that project. The job required that all the pipes be taken out of the ceiling and that the ceiling be replaced. Brock testified that 95 percent of this project was performed by outside contractors. For example, outside contractors performed the electrical work, the plumbing work, and steel fabrication work. Coastal removed the old sprinkler system, took it completely out, and shut the system down and put all new pipe back up. Brock stated that Gwaltney was trying to have the work completed during the weekends and the time for completion of the work was running out. He said that they had difficulty finding any contractors to come in at the time and Coastal agreed to run the waterlines for the project. He also said that since Coastal normally performed sprinkler system work for Gwaltney, if Gwaltney had been able to find another contractor, they would have had the other contractor perform the waterline work. Brock said that the Gwaltney employees were not actually doing any construction, repair, or demolition on the pack floor project. Brock did say that his maintenance employees might have run some vacuum lines and PVC pipe for that project since it was very simple to cut and glue those together, but the electrical work, plumbing work, and steel work was all performed by outside contractors.

Brock stated that, in the year 2000, there were several projects going on at the plant involving reinstalling all of the ceilings, "practically all of the ceilings in the plant." Brock testified that, as to all of this ceiling work, not just the ceiling work in the retail pack floor area, outside contractors performed 95 percent of the work, though his maintenance personnel did "some repairs on the pipes." Brock noted that Coastal was doing all of the sprinkler system work at that time and that any "significant plumbing work" was done by an outside plumber. As to the retail pack floor project, Gwaltney had contracted with Coastal Fire Protection "to provide labor and materials" and Coastal "furnished everything for the sprinkler system." Brock admitted that Gwaltney may have given Coastal some valves or fittings occasionally, but indicated that Coastal provided most of their own materials. Brock stated that Coastal also provided its own tools, though Gwaltney may have provided a scissor lift. Furthermore, Coastal provided its own foreman to oversee the work of Coastal's employees. Brock would simply tell the Coastal foreman what work he wanted performed and where he needed the lines and leave it up to him as to how the work was done. Brock testified that, after the project was completed, Gwaltney employees would actually tie in all of the newly-installed waterlines to the individual machines in the plant. Brock testified that the Coastal supervisor with whom he

coordinated at the time of the plaintiff's injury was Timothy C. Fitch and that he was the one who showed up ninety percent of the time.

Brock also clarified that, prior to the retail pack floor area renovation project, the work that Coastal was performing pursuant to its contract was sprinkler system installation and repair work. Brock said that, by August 2000, when this incident occurred, Coastal had completed the other sprinkler line job that they had been performing. Brock stated that the sprinkler lines and the waterlines were distinct systems. Brock said that, if they had needed any additional repairs on the sprinkler systems at the same time that this injury occurred, they would have likely contacted Coastal, even though Coastal had finished its prior sprinkler system repair work before August 2000.

The plaintiff testified next, indicating that he had never worked at the Gwaltney plant prior to the day of this incident. Plaintiff testified that, at the time of this incident, he was carrying a ladder back to a place in the plant where he understood that Coastal was going to be doing some demolition of a sprinkler system. The plaintiff also said, reviewing his prior deposition testimony, that he understood that Coastal was going to take some sprinkler pipe down and move it so "they" could do their work. While there was some dispute about who "they" referred to in the deposition, the plaintiff ultimately disclaimed any inference that it meant Gwaltney and indicated that it was Coastal.

The plaintiff's Coastal supervisor at the time of the accident, Timothy C. Fitch, testified next. Fitch said that he now works with his own contracting company and does some contracting work for Gwaltney's Smithfield plant. Fitch testified that, on the day of the plaintiff's incident, Coastal was involved in moving waterline pipe to the outside of the retail pack floor room. He said that Coastal was not supposed to remove the old waterline pipe inside the room, just install the new waterline on the outside of the building. Mr. Fitch also said that Gwaltney informed him where he was supposed to drop the valves from the new outside pipe for the inside connections, *but* Gwaltney did not help Coastal run the new outside water pipe on the day of plaintiff's injury.

Fitch testified that, at the time of the incident, Coastal had not yet started working on the pack floor room. He said he and Fose were actually walking into the plant with their tools when Fose fell. Fitch confirmed that the job that they were starting that day was the job on the retail packing floor and that the main water piping was running through that retail packing floor area. Fitch stated that Coastal "diverted it from going through there for -- because the pipe would sweat." Fitch stated that Coastal was instructed to run the pipe outside. Fitch described the scene that day as having everyone in the retail packing floor renovation area, including Gwaltney employees, the electrical contractors, and other contractors along with Coastal. He stated that Gwaltney employees were

working on various things but, if he needed something, he would at times ask a Gwaltney employee who would provide the item. Fitch also stated that Coastal was only working on waterlines on the day of this incident. Fitch confirmed that, once the pipe had been run by Coastal employees outside of the building and through the wall, Gwaltney was the one that took the pipe from the valve to the equipment. Fitch testified that, as to the waterlines that remained inside, they were to be removed at a later time and that was someone else's responsibility to take those down.

Kenneth Graham, Jr., who is the current plant engineer at Gwaltney's Portsmouth plant and was a maintenance supervisor at the time of plaintiff's injury, testified next. He stated that the work being done that day was replacement of some ceiling in the retail pack floor area. He said that, in addition, electrical, air, water, and fire sprinkler system work was being done in that area. Graham testified that the goal of this project was to remove everything from the ceiling so that there would be a clean ceiling to work with. He stated that Gwaltney's maintenance crew was inside the room itself moving airlines and waterlines to facilitate the packaging machines and that Coastal was there moving the waterlines on the outside of the wall. Graham stated that the basic goal for the work that day was that his maintenance crew was working on the inside and "Coastal was to do the additional part of it." He also said that the two groups would make their "tie together at the wall inside the room." Graham said he was the Gwaltney supervisor of the work that day and that it was his responsibility to give all of the contractors working on that particular project the scope of work that he wanted to be completed and it was up to them to perform such work. Graham stated that his maintenance crew had in the past done plumbing work, run airlines, and run waterlines, but that "the two things that we don't do I'll say is the fire sprinkler system because of the national fire protection that it comes under, and we don't do the ammonia lines. They have to be certified for ammonia refrigeration."

Graham also testified that, during the previous five years, there had been a project called the bulk operation project, which was an effort between Gwaltney maintenance and Suffolk Iron Works to tear down the smokehouse itself. He testified that Gwaltney maintenance took all of the lines out, capped their lines off, cut the steam off, and took care of those things. He also agreed that, with regard to the retail pack floor project, 95 percent of the work performed there was performed by a third party or outside contractors. Graham said that the Gwaltney employees ran the lines from the machines to the clothesline post to the walls to pick-up where Coastal finished and that Coastal put in the main pipes. In other words, Graham indicated that the Gwaltney employees hooked the machines up to the water while Coastal put in the main pipeline. He said that

the main work of the maintenance employees was to work on the machines in the plant, except on the weekends when they had other duties. He confirmed that there was no construction division in the maintenance department in 2000. Furthermore, Graham said that the Gwaltney employees did not install any main waterlines.

On redirect examination Graham said that, on August 5, 2000, Gwaltney employees were "running air and waterlines." Upon further examination, Graham said that there were three main waterlines that ran through the retail packing floor room and Gwaltney's goal was to have a clean ceiling in that room so that there would be no penetrations in the ceiling. He stated that Coastal's scope of work "where it came into the room they actually ninetied it through another wall and run it on the back side of that wall to where it was actually in a cooler instead of it being attached to the ceiling that was along a cinder block wall in a vertical position." Graham further stated that Coastal was to install a new metal pipe on the outside of the wall in order to divert it off the ceiling and mount it on that outside wall. He stated that the old piping on the ceiling had been capped off and was still in place when Coastal arrived. Upon examination by the Court, Graham stated that Coastal was only supposed to be taking a metal pipe and running it outside the wall of the retail packing floor room and that was the only job that they were supposed to be doing that day. He stated that Gwaltney employees were actually running waterlines from the inside of the retail packing floor room because there are four machines that have to be supplied with water. Therefore, Gwaltney employees were running City water, recirculation water, airlines, and vacuum lines. He stated that Gwaltney was "installing our four lines inside while they [Coastal] were installing the outside." He went on to say, in explaining why Coastal was doing this work, "we just didn't have enough help to accomplish, I guess, the goal before Monday."

## II. Discussion

### A. Standard

A plea in bar is a defensive pleading that reduces litigation to a single issue, which, if proven, creates a bar to the plaintiff's right of recovery. *Cooper Industries v. Melendez*, 260 Va. 578, 594, 537 S.E.2d 580, 595 (2000). The party asserting the special plea bears the burden of establishing the defense. *Whitley v. Commonwealth*, 260 Va. 482, 493, 538 S.E.2d 296, 302 (2000).

## B. Exclusivity of Workers' Compensation Act

Plaintiff contends that the work being performed by Coastal was not part of the normal trade, business, or occupation of Gwaltney such that the Workers' Compensation Act should provide his exclusive remedy, and that he should therefore be permitted to maintain this tort action against Gwaltney. Gwaltney essentially contends that the work being performed by Coastal was part of the normal trade, business, or occupation of Gwaltney such that plaintiff's exclusive remedy is a claim for workers' compensation benefits pursuant to the provisions of the Virginia Workers' Compensation Act, and the plaintiff should not be permitted to maintain this tort action. Gwaltney also argues, alternatively, that it is not a stranger to the particular work that the plaintiff was preparing to perform on the day he was injured, and plaintiff should not be permitted to maintain this action.

The fundamental purpose of the Virginia Workers' Compensation Act is to afford an employee injured in an industrial accident a certain measure of recovery absent considerations of fault. *Harbin v. Jamestown Village Joint Venture*, 16 Va. App. 190, 196, 428 S.E.2d 754, 757 (1993); *Virginia Workers' Compensation*, § 11.01 (Matthew Bender & Co. 2005). While an employee injured in the course of employment surrenders his right to bring a common law damage suit against his employer, in exchange he receives all the benefits of the Workers' Compensation Act without the burden of establishing the employer's negligence. In essence, the employer has agreed to be unconditionally liable as the price of limiting its liability. *Virginia Workers' Compensation, supra*, § 11.01. However, the limitations of remedies imposed on an injured employee by the Workers' Compensation Act are not applicable only to the employee's immediate employer. Therefore, the mere fact that Fose was employed by an employer other than the alleged tortfeasor, Gwaltney, does not automatically mean that Fose can maintain a tort suit against the alleged tortfeasor.

While the Virginia Workers' Compensation Act prohibits an employee from bringing a tort action against his direct employer, it also bars a personal injury action against a party who is deemed to be the employee's statutory employer. As the Virginia Supreme Court has noted, not only does the Virginia Workers' Compensation Act prevent an employee subject to its provisions from filing an independent tort action against his employer or any fellow employee for injuries received in the course of employment, "[u]nder certain circumstances, Code § 65.2-302 extends this immunity from tort liability arising from workplace accidents to qualifying employers, even though no direct common law contract of employment exists between such

employers and employees." *Hudson v. Jarrett*, 269 Va. 24, 29-30, 606 S.E.2d 827, 829 (2005). The *Hudson* Court said, an "employer qualifies for immunity if the employer, acting as a general contractor, contracts with another to perform all or part of the employer's trade, business, or occupation," and under "these circumstances, the employer is deemed the statutory employer of the employees of such other subcontractor and the remedies under the Act are the statutory employee's exclusive remedy against the statutory employer." *Id.*

## C. Statutory Employment Tests

There are three tests frequently applied in determining whether an injured employee is a statutory employee of a non-governmental employer: (1) the "normal work" test, (2) the "subcontracted fraction" test, and (3) the "stranger to the work" test. *Stone v. Door–Man Manufacturing Co.*, 360 Va. 406, 415, 537 S.E.2d 305, 309 (2000). Where these tests are applied and the statutory employer relationship imposed by Va. Code § 65.2-302(A) is present, the provisions of Va. Code § 65.2-307 then apply to make a claim for workers' compensation benefits the exclusive remedy of an injured statutory employee.

Va. Code § 65.2-307(A) provides that:

> [t]he rights and remedies herein granted to any employee when his employer and he have accepted the provisions of this title respectively to pay and accept compensation on account of injury or death by accident shall exclude all other rights and remedies of such employee . . . at common law or otherwise, on account of such injury. . . .

*See Berner v. Mills*, 265 Va. 408, 413, 579 S.E.2d 159, 161 (2003). This was the statute in effect on the date of plaintiff's injury.

Applying the "normal work" test, a project owner becomes a statutory employer when it contracts with a subcontractor for the performance of work that is part of the owner's trade, business, or occupation. In such a situation, the owner becomes liable to the employees of the subcontractor for compensation benefits as if the employees were immediately employed by such subcontractor. Va. Code § 65.2-302(A) provides that:

> [w]hen any person (referred to in this section as "owner") undertakes to perform or execute any work which is a part of his trade, business, or occupation and contracts with any other person

(referred to in this section as "subcontractor") for the execution or performance by or under such subcontractor of the whole or any part of the work undertaken by such owner, the owner shall be liable to pay to any worker employed in the work any compensation under this title which he would have been liable to pay if the worker had been immediately employed by him.

(Statute in effect on date of injury.) Because a statute is always construed to operate prospectively, we must always be careful to look to the statute in effect at the time of the injury.

For example, in *Johnson v. Jefferson National Bank*, 244 Va. 482, 485, 422 S.E.2d 778, 780 (1992), the Virginia Supreme Court applied the "normal work" test to determine statutory employment and said that "[w]hether these plaintiffs can maintain a common law negligence action against the Bank [defendant] depends upon whether the work performed by Berry, the independent contractor, was part of the Bank's 'trade, business, or occupation'." The *Johnson* Court also recognized that the test to be applied in resolving the issue "is not one of whether the subcontractor's activity is useful, necessary, or even absolutely indispensable to the statutory employer's business . . . [but] is whether this indispensable activity is in that business, *normally* carried on through employees rather than independent contractors." *Johnson*, 244 Va. at 485, 422 S.E.2d at 780 (*citing Shell Oil Co. v. Leftwich*, 212 Va. 715, 722, 187 S.E.2d 162, 167 (1972)).

The "subcontracted fraction" test referenced above excepts from the "normal work" test "those cases where the work is obviously a subcontracted fraction of a main contract'." *Stone*, 260 Va. at 416, 537 S.E.2d at 310. As one court has stated the analysis, these two prongs of the test set out in *Shell Oil* are to be applied progressively; that is, the normal–work test is the first step in the analysis with the subcontracted–fraction test to be applied only if the requirements of the first test are not met." *Ferreira v. Boeing Service Co.*, 60 Va. Cir. 237, 239 (Fairfax County 2002).

The Virginia Supreme Court has also applied the exclusivity provisions of the Workers' Compensation Act where the third party to the employer–employee relationship is not a "stranger" to the trade, business, or occupation of the employer, also known as the "stranger to the work" test. On August 5, 2000, Va. Code § 65.2-309 provided that a "claim against an employer under this title for injury or death benefits shall operate as an assignment to the employer of any right to recover damages which the injured employee . . . may have against any *other party* for such injury or death. . . ." (Emphasis added.) An "other party" was further defined by Va. Code § 65.2-800 on August 5,

2000, as follows: "[a] person other than an employer *or statutory employer*, or a person employed by either, whose acts result in such injury or death shall be deemed an 'other party' within the meaning of § 65.2-309." (Emphasis added.) Logic dictates that, if the employer can sue an "other party" pursuant to these code provisions, then the employee of such employer can sue an "other party." *Hudson*, 269 Va. at 29, 606 S.E.2d at 829. As the Court noted in *Clean Sweep v. Talley*, 267 Va. 210, 213, 591 S.E.2d 79, 81 (2004), "the rights and remedies provided in the Workers' Compensation Act are exclusive of all other rights and remedies of an employee. . . ." The Court went on to recognize the exception to this exclusivity provision provided in Va. Code § 65.2-309(A) permitting an action to be maintained against an "other party." In order to "be an 'other party,' a defendant must have been a stranger to the trade, occupation, or business in which the employee was engaged when he was injured." Furthermore, "[b]ecause he is not a 'stranger to the employment,' an allegedly negligent employer of one contractor, engaged in the same business or project of an owner as an injured employee of another contractor, is not an 'other party' amenable to suit. . . ." *Id.* In *Stone*, 260 Va. at 417-18, 537 S.E.2d at 310-11, the Court recognized that the "stranger to the work" test is *the* test to apply when an employee of a general contractor (or owner) makes a personal injury claim against a subcontractor.

Fose argues for application of the "normal work" test set out in *Shell Oil*, 212 Va. at 722, 187 S.E.2d at 167. Gwaltney suggests that both the "normal work" test and the "stranger to the work" test yield the same result. While the Virginia Supreme Court has recognized that a determination of the trade, business, or occupation of an entity "does not readily yield [itself] to categorical or absolute standards," *Bassett Furniture Industries, Inc. v. McReynolds*, 216 Va. 897, 902, 224 S.E.2d 323, 326 (1976), it has provided significant guidance in the case law discussed above. Accordingly, we must apply the legislative language and case law to the facts of this case to determine whether the exclusivity provision of the Workers' Compensation Act apply to preclude Fose's current action.

Whether a person is a statutory employer presents a mixed question of law and fact and must be decided on the facts and circumstances of each case. *Hudson*, 269 Va. at 30, 606 S.E.2d at 829. Having reviewed numerous cases involving various sets of facts, the Court believes that the facts of *Johnson*, and its application of the "normal work" test of *Shell Oil Co.*, 212 Va. 715, 187 S.E.2d 162, control here because we have a vertical employment relationship at issue involving a subcontractor's employee seeking damages against an owner. It appears clear that, in such cases, the Virginia Supreme Court applies the "normal work" test. *See Whalen v. Dean Steel Erection Co.*,

229 Va. 164, 170, 327 S.E.2d 102, 105-06 (1985) (*Shell* and its progeny consider "whether a subcontractor's employee, injured by a general contractor's (or owner's) negligence on the job, may sue such general contractor or owner at common law or whether such general contractor or owner has become the statutory employer of the plaintiff. . . ."); *Ferreira*, 60 Va. Cir. at 240 (where injured plaintiff is employee of subcontractor and sues the owner, the normal work test can be applied and the stranger to the work test need not be addressed). As noted above, in *Shell*, the Virginia Supreme Court stated that the normal work test to be applied in resolving the statutory employer issue "is not one of whether the subcontractor's activity is useful, necessary, or even absolutely indispensable to the statutory employer's business . . . [but] is whether this indispensable activity is, in that business, *normally* carried on through employees rather than independent contractors." *Shell*, 212 Va. at 722, 187 S.E.2d at 167. Accordingly, the Court must apply this "normal work" test to the facts presented at the hearing on defendant's plea in bar.

### D. Application of "Normal Work" Test

The evidence before the Court shows that Gwaltney maintenance employees routinely performed minor waterline repairs such as those involving leaks, fittings, and valves. Brock, the plant engineer at the time of plaintiff's injury, testified that Gwaltney employees would repair non-sprinkler waterlines and occasionally move them when necessary. But Brock said that the project on which the plaintiff was injured required all the pipes be taken out of the ceiling and that 95 percent of the project was performed by outside contractors. He further said that any significant plumbing work at the Gwaltney plant was done by an outside plumber. Plaintiff's Coastal supervisor, Fitch, said that his understanding of the work to be performed on the day plaintiff was injured was installation of a new waterline on the outside of the building where the retail pack floor is located. Fitch understood that, once Coastal installed that line through the wall into the retail pack floor room, Gwaltney was to drop valves from the point where the new outside water pipe entered the retail pack floor room so that the machines could be connected in that room via inside water connections. Fitch said Gwaltney did not help Coastal install the outside water pipe on the day of the injury. Graham, who was a Gwaltney maintenance supervisor at the time of plaintiff's injury, stated that Gwaltney's employees were inside the retail pack floor room moving airlines and waterlines to facilitate the packaging machines and that Coastal was there moving the waterlines on the outside of the wall, with the idea that

the two groups (Coastal and Gwaltney) would make their "tie together at the wall inside the room." He said that was the only job Coastal was performing the day of plaintiff's injury. He confirmed that 95% of the retail pack floor work was performed by outside contractors. Graham also said that it was not the normal work of Gwaltney employees to install main water lines in the plant.

It is clear from this recitation of the evidence that installation of water lines at the Gwaltney plant was normally carried out by independent contractors, and that any significant repair work at the Gwaltney plant involving the water lines was normally carried out by independent contractors. Furthermore, any plumbing work, on the waterlines, performed by Gwaltney's fifty to sixty person maintenance team was a "*de minimis*" part of the total business of the 500 employee meat processing plant. *Bassett Furniture*, 216 Va. at 900, 224 S.E.2d at 325. The primary task of that maintenance team was to work on the machines in the plant.

The Virginia case law recognizes that the construction or repair of a business' physical plant is not the trade, business, or occupation of the owner for purposes of determining statutory employment unless such activities are normally carried out directly by the owner as part of his normal activities. As the Virginia Supreme Court noted in *Nichols v. VVKR, Inc.*, 241 Va. 516, 522-23, 403 S.E.2d 698, 702 (1991), "virtually all businesses require some type of physical facility in which or from which their business is conducted," and "[p]roviding or acquiring this facility is incidental to, perhaps necessary to, conduct of the owner's business, but adaptation of the facility so as to permit conduct of the intended activity is not itself the trade, business, or occupation of the owner." The *Nichols* Court went on to state that "[w]e have considered construction or repair of such a facility not to be the trade, occupation, or business of an owner for purposes of determining whether a statutory employee or employer relationship exists unless those activities are normally carried out directly by the owner or are part of his normal activities." *Id.* The *Nichols* Court concluded that "[n]othing in this record supports a conclusion that the construction or rehabilitation of a transportation/retail facility is the trade, business, or occupation of providing mass transportation services, GRTC's clear purpose." *Id.* Similarly, there is little support in the record for the proposition that installation of water pipes for the retail pack floor room in Gwaltney's plant is the trade, business, or occupation of processing meat into hot dogs, bologna, sausages, etc.

Considering the particular facts before this Court, perhaps the most instructive case from the Virginia Supreme Court is *Johnson*, 244 Va. at 484-85, 422 S.E.2d at 779-80. In *Johnson*, two employees of a paint contractor

were painting the exterior trim on an office building owned and occupied by a bank. The bank and the paint contractor entered into a contract providing that the paint contractor would paint the exterior metal trim of the bank's data center building. The two employees were painting from a metal scaffold suspended from a ledge above. The scaffold was approximately nineteen feet above a utility pole with high-voltage electrical lines connected to the pole. *Id.* at 483-84, 422 S.E.2d at 779. The paint contractor had requested that the bank have the electrical lines de-energized or protectively insulated and the bank knew when the painting contractor would be there to paint. However, the bank failed to take any such action and the wire ropes supporting the scaffolding came in contact with the electrical wires, causing the ropes to burn through and the two employees to fall to the pavement below. *Id.*

At the time of the accident, the bank employed a ten person maintenance staff, including carpenters, electricians, security people, a yardman, and two "general all-purpose" employees, all with responsibility for maintenance of approximately eighty-five buildings. Members of this maintenance staff had painted the exterior and interior of two to five of the buildings annually. *Id.* However, at times, the bank also engaged independent contractors to paint its facilities because the bank did not have adequate staff to do these different projects on a timely basis. While the bank staff had painted buildings, as noted above, they had not used scaffolding for painting in high places such as where the two employees were painting at the time of the accident. Relying upon *Bassett*, the *Johnson* Court concluded that *Bassett* controlled the outcome, specifically noting that, in *Bassett*, there was no separate construction division, only a maintenance crew that was sometimes used to construct all or part of minor projects and sometimes to make modifications to tie in with major projects. *Johnson*, 244 Va. at 487, 422 S.E.2d at 781.

The Court in *Johnson* concluded that several factors militated in favor of finding that the two employees were not engaged in the trade, business, or occupation of the bank at the time of the incident: (1) although the bank maintained a small maintenance crew, its principal business was banking; (2) although the bank maintenance staff regularly painted the interior and exterior of the bank's facilities, the bank frequently engaged independent contractors because it did not have an adequate staff to do the various projects on a timely basis; and, (3) more significantly, the bank's employees had never painted at the height and under the conditions in which the two employees were working. *Id.* Reflecting on these factors, the Court concluded that "while the Bank's maintenance staff may have had the capacity to do the work that [the painting contractor] was doing when the accident occurred, such work was not *normally* performed by the Bank. Consequently, we hold that Johnson and

Viers were not the Bank's statutory employees because Berry was not engaged in an activity that was part of the Bank's trade, business, or occupation." *Id.*

Looking at each of these factors, virtually the same thing can be said in this case. While Gwaltney maintained a relatively small maintenance staff at the time of plaintiff's injury, its principal business was meat processing, not plumbing installation. While Gwaltney's maintenance staff repaired pipes at its facility at the time of plaintiff's injury, it frequently engaged independent contractors because it did not have an adequate staff to do the various projects on a timely basis, which is precisely what is alleged to have happened here when this accident took place. Significantly, most of the witnesses testified that Gwaltney employees had never installed water lines in the way that Coastal was to install these water lines on the day of the accident. Therefore, while Gwaltney's maintenance staff may have had the capacity to do the work that Fose was supposed to do when the accident occurred, such work was not *normally* performed by Gwaltney. Therefore, Fose was not Gwaltney's statutory employee because Fose was not engaged in an activity that was part of Gwaltney's trade, business, or occupation.

Even if the Court applied the "stranger to the work" test, the same result would occur. Fose's action would not be barred under that test because Gwaltney is a stranger to the work of Fose and Coastal. The work Fose was performing for Coastal at the Gwaltney plant was not an essential part of the work of Gwaltney, which is meatpacking. *See Stone*, 260 Va. at 419, 537 S.E.2d at 311 (where Court commented upon outcome if alternate test was applied in statutory employer context).

### III. Conclusion

The defendant's Plea in Bar is overruled. Because the parties have thoroughly briefed this matter, because the oral arguments were transcribed by a court reporter, and because the Court has reviewed such arguments in this Opinion and Order, the Court will dispense with the Va. Sup. Ct. R. 1:13 counsel endorsement requirement. The briefs of the parties are ordered filed. It is so ordered.